## SUPREME COURT.

### George W. Jones agt. William H. Seward.

The *constitution of the United States* has never invested the *President* of the Uni-ted States, either in his civil capacity, or as commander-in-chief of the army and navy, with power to *arrest or imprison*, or to *authorize another* to arrest or im-prison any person *not subject to military law*, at any time or under any exigency, *without some order, writ or precept or process of some civil court of competent jurisdiction.*

And where an action for damages is instituted in a *state court*, which brings in ques-tion this power to arrest and imprison a citizen of such state, the state court has full *power and jurisdiction* over the subject.

*New York Special Term, October,* 1863.

THIS was a motion to transfer the action to the United States circuit court, under the act of congress of March 3, 1863, entitled " An act relating to *habeas corpus*, and regu-lating judicial proceedings in certain cases." The plaintiff,

who is an ex-senator, on his return from Bogota, where he occupied the position of United States minister under President Buchanan, on coming to New York from Washington, where he had been to submit his accounts, was arrested and incarcerated in Fort Lafayette, by order and direction of the defendant.

     Jas. T. Brady and W. C. Traphagen, *for the motion.*
     John McKeon and Mr. Mead, *in opposition.*

     Clerke, Justice. This is an action in which the plaintiff claims damages for an alleged false imprisonment. The defendant asks for an order of this court to remove the action, and all proceedings therein, to the next circuit court of the United States, to be held in and for the southern district of the state of New York. The defendant states in his petition for this order, that the action is brought for acts alleged to have been done by him as secretary of state for the United States of America, under authority derived by him from the President of said United States, in causing and procuring the plaintiff to be arrested and imprisoned, or for some other wrong alleged to have been done to the plaintiff under such authority, during the present rebellion of the so-called Confederate States against the government of the United States of America, and that it therefore comes within the act of congress passed March 3, 1863, entitled "An act relating to *habeas corpus*, and regulating judicial proceedings in certain cases," providing in the fifth section that if any suit has been or shall be commenced against any officer, civil or military, or any other person, for any arrest, imprisonment, trespass or wrong done, or any act omitted to be done, during the present rebellion, "by virtue or under color of any authority derived from or exercised by or under the President of the United States, or any act of congress," the defendant may remove such action into the circuit court

of the United States for the district where the suit is brought, on complying with certain requirements stated in the act.

Of course, this act, so far as it directs the transfer of cases from the state to the federal jurisdiction, if it has any constitutional foundation, is founded upon the third article of the constitution of the United States, defining the extent of the judicial power delegated by the states to the federal government, and particularly upon that part of section 1 of said article which says that " the judicial power shall extend to all cases in law and equity arising under this constitution," &c. The defendant in this application maintains that the defence which he intends to set up in this action arises under the constitution of the United States ; the question to be determined being, whether the President of the United States, during a rebellion or insurrection, can arrest or imprison, or authorize another to arrest or imprison, any person not subject to military law, without any order, writ, precept or process of some court of competent jurisdiction. Now, we assume that this question, if a question at all, would arise under the constitution of the United States ; that is, whether the President possesses this power, either in his civil capacity, or as commander-in-chief of the army and navy of the United States, and can be solved only by consulting and interpreting that instrument. But, to entitle the defendant to this order, and to give the courts of the United States jurisdiction of this action, there must be some appearance or color of substance in it. It must have some speciousness, some seeming of plausibility, and must not be palpably devoid of any ground of doubt. Can it then be a question, presenting any appearance of substance or color of doubt, whether the constitution of the United States of America has invested its chief executive officer with power to arrest or imprison, or to authorize another to arrest or imprison, any person not subject to military law, at any time, or under any exi-

gency, without some order, writ or precept or process of some civil court of competent jurisdiction ?

I. It cannot, of course, be pretended by the most ardent advocate of this high presidential prerogative, that the constitution confers it in set terms. There is, assuredly, nothing in that instrument which can be tortured into the conferring of such a power on the President in his civil capacity ; and this, it appears to me, plainly disposes of the question ; for it would be asserting the grossest contradiction and strangest anomaly to say, that absolute and unlimited power, equal to any exercised by Czar or Sultan, can be implied from a constitution which avowedly gives no power to any department of the government that is not specifically set forth, except simply the consequent right to employ all legal means necessary to the execution of the power.

It may not, however, be out of place, at a time like the present, to glance at the position which some ardent advocates of presidential unlimited prerogative, in seasons of war, rebellion or insurrection, have endeavored to uphold. It is demanded for the President, by these advocates, from the nature and necessities of his office, in times of imminent peril to the very existence of the nation. They have ventured to say, that the authors of this constitution could never have intended to deny to him in such times all power which may be deemed indispensable for the preservation of the nation, when it is convulsed by civil commotion and threatened with the hostility of foreign powers. But, if there is anything beyond all controversy in the constitutional history of this nation, it is that the purpose of this constitution and the provisions which it contains were, for a considerable period before its-adoption, anxiously and deliberately considered and thoroughly discussed by the people at large and by their delegates in the convention ; and, certainly, any man proposing to confer unlimited power on any department of the government, on any pre-

Jones agt. Seward.

text whatever, would not have been deemed sane. With far-seeing caution and the most vigorous and deliberate purpose, a constitution .for a national government was framed, conferring extremely limited powers, concisely and minutely specified, at the same time providing ample means for self-preservation, and the vigorous exercise of necessary authority under all emergencies. Its authors and the people of the several states had plainly set before them, while it was under consideration, the example and experience of that nation from which their language, their laws, their social customs and political institutions were mainly derived ; and they well knew that the contest which convulsed that nation for four centuries with great alternations of triumph and defeat, vital and pre-eminent, immeasurably above all others, related to the power of the crown over the personal liberty of. the subject.

No doubt, before constitutional liberty was established in England, the monarch claimed, and often exercised, the power of arbitrary arrest and imprisonment ; and, during the reigns of the Tudors and the Stuarts, it was held by some judges that, " although the King could make no laws but by common consent in parliament, yet, in time of war, by reason of the necessity of it to guard against dangers that often arise, he useth absolute power, so that his word is law." Indeed, it was asserted, even in parliament, on behalf of Elizabeth, that the " Queen inherited both an enlarging and a restraining power ; by her prerogative, she might set at liberty what was restrained by statute, or otherwise, and by her prerogative she might restrain what was otherwise at liberty ; that the royal prerogative was not to be canvassed, nor disputed, nor examined, and did not even admit of limitation ; and that absolute princes, such as the sovereigns of England, were a species of divinity."

It is shown from indisputable authority that, at least during the Tudor dynasty, " whenever there was any insurrection or public disorder, the crown employed martial

law; and it was during that time exercised, not only over the soldiers, but over the whole people. Any one might be punished as a rebel or an aider and abettor of rebellion, whom the provost-marshal or lieutenant of a county, or their deputies, pleased to suspect." This power was employed by Queen Mary in defence of the old theology, and by Queen Elizabeth in defence of the new; and after the suppression of the northern rebellion, which agitated the kingdom during a portion of the reign of the latter princess, she severely rebuked the Earl of Essex because she had not heard of his having executed any criminals by martial law.

In 1552, when there was no rebellion or insurrection, King Edward granted a commission of martial law, and empowered the commissioners to execute it in such a manner as should be thought by their discretion most necessary. Hume mentions numerous other instances of the exercise of this despotic power during the reign of Elizabeth. But the more general diffusion of knowledge and the progress of civilization, produced by the revival of learning, the invention of printing, and the discovery of the western hemisphere, aroused the people to a sense of their debased condition, and the vindication of their ancient rights; and her successor, James I, found his claims of divine right and unlimited prerogative frequently disputed. It was not, however, until the reign of his perfidious and unfortunate son, that any organized resistance was made to these claims.

But, above every other invidious claim of prerogative, the power of arbitrary imprisonment was the most abhorrent to the nation. In the debates in and out of parliament, while the committee were engaged in framing the petition of right, the inviolability of personal liberty was deemed paramount even to the right to life and property. " To bereave of his life a man not condemned by any legal trial," it was contended, " is so egregious an exercise of

tyranny that it must at once shock the natural humanity of princes, and convey an alarm through the whole commonwealth. To confiscate a man's fortune, besides being a most atrocious act of violence, exposes the monarch so much to the imputation of avarice and rapacity, that it will seldom be attempted by any civilized government. But confinement, though a less striking, is no less a severe punishment; nor is there any spirit so erect and independent as not to be broken by the long continuance of the silent and inglorious sufferings of a prison." The power of imprisonment, therefore, it was maintained, being the most natural and potent engine of arbitrary power, it was absolutely necessary to remove it from a government which is free and legal.

These principles, on which the act known by the name of the petition of right, and which has been called the second great charter of the liberties of England, were ratified by the King. He thus solemnly bound himself, among other things, never again to imprison any person except in due course of law, and never again to subject civilians to the jurisdiction of courts-martial. How shamefully he violated this solemn covenant, and how ignominiously he forfeited his life and his crown, as the righteous punishment of his perjury, is one of the saddest and gravest and most instructive records of history. His sons and successors, Charles II and James II, particularly the latter, indifferent to or forgetful of the fate of their father, did not hesitate, when occasion seemed to require, to violate the rights of their subjects, until James, at length, intimidated by the indignation of all classes of his people, struck with terror, saved himself from the death which he deserved, by timely flight, and ended his wicked and disgraceful career as a pensioner of France. His abdication ended the long struggle forever in favor of the exemption of the basest and humblest criminal from arbitrary imprisonment under any pretence, and constitutional liberty

was *established* in England. In order to place it on principles impossible to be misunderstood or evaded, the convention issued their declaration of right before the crown was offered to William and Mary. On these conditions it was thankfully accepted. The principles which the convention reiterated were, indeed, as Macaulay says, engraven on the hearts of Englishmen during four hundred years : " That without the consent of the representatives of the nation," he continues, " no legislative act could be passed, no tax imposed, no regular soldiery kept up ; that no man could be imprisoned, even for a day, by the arbitrary will of the sovereign ; that no. subordinate could plead the royal command as a justification for violating any right of the humblest subject, were held, both by whigs and tories, to be fundamental laws of the realm." But despotic monarchs, under some plea of necessity, as we have seen, frequently disregarded those laws. The declaration of right, and the mutiny act passed soon after, put an end forever to any pretext, on behalf of the crown, to deprive a civilian of his personal liberty without some order, writ, precept, or process of some court of competent civil jurisdiction. It has never been pretended, since the declaration of right was proclaimed, and the first mutiny act was passed, that any but members of the army and navy were subject to martial law or the articles of war. It was conceded by all the counsel in *Grant* agt. *Gould* (2 *H. B.* 69), and reiterated by the court, that martial law could only be exercised in England so far as it is authorized by the munity act and the articles of war, which have cognizance only over the army and navy. Martial law, in the proper sense of the term, does not exist, and never has existed in England since the revolution. The mutiny act and the articles of war, like the military code, &c., adopted by congress, constitute what may more properly be called military law ; and, though they provide for courts-martial for the trial of military offenders, they are

totally different from that kind of martial law which prevails in despotic countries, and which legally exists under constitutional governments only within the immediate theatre of war or insurrection. Undoubtedly, on some occasions the writ of *habeas corpus* has been suspended, but never without the consent of parliament.

Now, is it possible that all the passages to which I have referred, in the constitutional history of England, and all the solemn and salutary warnings which they convey, were not engraven on the minds of the enlightened men who had the principal share in the formation and adoption of the present constitution of the United States of America ? Can it be supposed, for a moment, that any implied power, such as the defendant claims for the presidential office in the present instance, would have been tolerated by those men ? If they intended that a dictatorship should exist under any emergency, they would not leave it to the chief executive to assume it when he may, in his discretion, declare necessity required it, but would at least provide that this necessity should be declared by congress, and, as under the constitution of ancient Rome, that the legislative power alone should select the person who should exercise it. That the President can, of his own accord, assume dictatorial power, under any pretext, is an extravagant assumption. The proposition cannot be entertained by any court; no such inquiry can arise under the constitution of the United States ; it does not reach to the proportions or stature of a question.

II. It is, however, maintained, if the President does not possess this power in his civil capacity, that he does possess it in his military capacity as commander-in-chief of the army and navy of the United States. A commander of an army has, of course, within the sphere of his military operations against an enemy, all power necessary to insure their success. General Rosecrans had a right, I have no doubt, the other day to destroy all property which caused

any obstacles to his operations against Bragg; and if he discovered any plots to mar those operations, or to give intelligence to the enemy, or to afford them any kind of aid or comfort, he would have a right to try the offenders, whether civilians or soldiers, by a court-martial. But his power does not extend beyond his lines. If a man at Cincinnati has a correspondence with Bragg, giving him intelligence of the plans of Rosecrans, the latter cannot have the offender arrested at Cincinnati, brought within his lines, and tried by a court-martial. This man is, indeed, emphatically a traitor; he is guilty of high treason against the United States of America; but he is to be tried by a civil tribunal, according to the course and practice of the established law, on a presentment or indictment of a grand jury. His case has not arisen in the land or naval forces, or in the militia when in actual service in time of war or public danger. (*See 5th amendment of the constitution.*) Although it indeed affects the operations of a certain portion of the land forces, it is not a military but a civil offence. Neither can even the commander-in-chief of the army extend martial law beyond the sphere of military operations. If he possessed this power, in time of war or insurrection, over the whole extent of the nation, whether within the theatre of military operations or not, the political institutions and laws of the land would be entirely at his mercy. A whisky insurrection in western Pennsylvania would authorize him to abrogate the law of liberty in Massachusetts or any other state. Martial law would extend, at the mere pleasure of the commander-in-chief, over the whole length and breadth of the land. It is beyond controversy, as we have seen, that this power does not vest in Mr. Lincoln as President; but as a military commander he can possess no greater power than if he was not President, and was merely commander-in-chief of the army and navy. Suppose the constitution vested the command-in-chief of the army and navy in some person other

than the President.   Could this functionary subvert the constitution and laws of the land on the plea of military necessity ?   Surely not ; and if he could not do it, neither can the President, unless the constitution has empowered him to do it in his civil capacity.

The opinion referred to by the counsel of the defendant, delivered by Chief Justice TANEY in *Luther* agt. *Borden* (7 *How.* 1), so far from sanctioning, makes no question of, this extension of the military power of the President.   An actual insurrection existed in the state of Rhode Island, and military measures to suppress this insurrection were in operation there, by the intervention of the federal government on the application (I forget which) of the legislature or executive of that state.   That commonwealth was in a condition of intestine war; and there, as in western Georgia and in Tennessee now, the officers engaged in the military service " might 'lawfully arrest any one, who, from the information before them, they had reasonable grounds to believe was engaged in the insurrection."

The formidable power, for which the defendant contends, is plainly not necessary to the safety of the nation, even if the constitution conferred it when that safety should be endangered.   Within the immediate theatre of insurrection or war, the commander-in-chief and his subordinates, where the exigencies of the occasion make it necessary, we repeat, do possess it ; beyond it the ordinary course of proceedings in courts of justice will be sufficient to punish any persons who furnish information or afford any aid or comfort to the enemy, or in any way are guilty of the detestable crime of betraying their country.   In sudden emergencies, caused by invasion or insurrection, the power expressly given by the constitution and the acts of congress, to repel the one and suppress the other, are ample and effective ; and it requires no exercise of arbitrary power over the sacred rights of personal liberty to accomplish this purpose.   It is as manifest as the day—it is beyond

all controversy—that these rights, in war or in peace, during invasion or domestic violence, even during the hideous rebellion which now confronts us, are, except in the cases which I have stated, inviolable. The President, therefore, whether in his civil capacity, or as commander-in-chief of the army and navy of the United States, has, unquestionably, no power to authorize the act of which the plaintiff complains. The ground upon which this application is made has no color of right. It cannot, in my opinion, be entertained as a question in any state or United States court. The only questions in this action worthy of consideration, and which can be entertained, do not arise under the constitution of the United States, but are fitly within the jurisdiction of this court.

The motion is denied, without costs.