## CHARLESTON

*In re* Mary Jones

*In re* Chas. H. Boswell

*In re* Charles Batley

*In re* Paul J. Paulsen.

Submitted February 28, 1913. Decided March 21, 1913.

1. Opinion in Similar Case Approved.

    The principles and conclusions of law announced in *State ex rel Mays* v. *Brown, Warden* and *State ex rel Nance* v. *Brown, Warden*, having been re-examined, after thorough argument and consideration, are approved and re-affirmed. (p. 572).

2. Insurrection—*"Martial Law"—Territory Subject.*

    A state of war having been declared in any part of the state on an occasion of insurrection, the war power of the state in the form of military rule, defined by the usages of nations, prevails in the territory subject to the proclamation, excluding the civil powers as to offenses, if the executive so order, while the peace powers of government under civil law prevail elsewhere. (p. 606).

Robinson, Judge, dissenting.

*For convenience of the Courts and Bar, this opinion is printed immediately following that of Nance and Mays. Hence, its appearance out of regular order.—Reporter.

3. SAME—*Martial Law—Power of Governor—Apprehension for Offenses.*

In such case, the governor may cause to be apprehended, in or out of the military zone, all persons who shall wilfully give aid, support or information to the insurgents, and detain or imprison them, pending the suppression of the insurrection. (p. 606).

4. JURY—*Martial Law—Power of Governor—Validity of Statute—Jury Trial.*

Sections 6, 7, 8 and 9 of chapter 14 of the Code, authorizing such arrest and imprisonment, do not violate the provisions of the state and federal Constitutions, inhibiting deprivation of liberty without a trial by jury, and are constitutional and valid. (p. 607).

5. CONSTITUTIONAL LAW—*Insurrection—Martial Law—Apprehension for Offenses—"Due Process of Law".*

Being so, such arrest, detention and imprisonment, by virtue of said statute, are effected by due process of law within the meaning of section 10 of Article III. of the Constitution of this state and the Fourteenth Amendment to the Constitution of the United States. (p. 608).

ROBINSON, JUDGE, dissenting.

Applications by Mary Jones, by Chas. H. Boswell, by Charles Batley, and by Paul J. Paulsen for writs of *habeas corpus.*

*Petitioners Remanded.*

Statement by POFFENBARGER, PRESIDENT:

On the petitions of P. J. Paulsen, C. H. Boswell, Charles Batley and Mary Jones, alleging their confinement in a military guard house, in the town of Pratt, by the military authorities of the state, acting under the orders of the governor; a proclamation by the governor of a state of war in the territory in which the said military guard house is, a portion of Kanawha county; the organization of a military commission to sit and act in said district for the trial of such persons as may properly be brought before them; their apprehension of petitioners in said county outside of said military district, by a civil officer, on complaints filed with a justice of the peace, charging them with a conspiracy to inflict bodily injury upon sundry persons unknown to the complainant and to destroy and injure personal property not their own, and the killing of one Fred Bobbitt in pursuance of said conspiracy; and their delivery by said officer

to the said military authorities by the verbal order of the governor; writs of *habeas corpus* were issued, directed to the governor, the adjutant general of the state and the members of the military commission, commanding them forthwith to produce the bodies of the relators.

The returns to the writs admit the arrests and detention complained of, the filing against the petitioners of charges and specifications prepared by the provost marshal, charging each of them with having conspired with numerous other persons to inflict bodily injury upon one Thomas Nesbit, and, in pursuance of such conspiracy, with having shot him with intent to maim and disfigure, disable and kill him, on or about the 10th day of February, 1913, within the district covered by the governor's proclamation of war; with having murdered one Fred Bobbitt and one. W. R. Vance within said district on or about the said date; with having otherwise conspired for such purposes and in such manner, and so far executed such conspiracy, as to render them guilty of felonies under what is known as the "Red Men's Act"; with having become accessories after the fact to the alleged murder of Fred Bobbitt by the rendition of aid to the principal felons in their efforts to escape; and with having unlawfully carried concealed weapons.

The arrest of the prisoners outside of the military district by a civil officer and conveyance of them into the military district are admitted, but it is denied that they were arrested without a warrant, and also that they were carried into the military district by the direction of the governor or any of the military authorities under his control. On the contrary, it is averred that a warrant was issued on the complaint of a citizen and the arrest made under the warrant, and that they were conveyed into the military district by the order of the justice of the peace to whom the warrant was returnable. The returns also denied any fixed purpose or determination on the part of the military commission to try and convict the petitioners and say the charges preferred against them have not yet been inquired into. Averring the arrests to have been made within the military district and denying them to have been made in pacific territory, they say the prisoners were arrested

in said district during a time of insurrection, riot or lawlessness in which insurrection, riot or lawlessness the petitioners were then participating.

As the basis of three successive proclamations of war in practically the same territory all within less than a year, they set forth large amounts of information collected by the governor and military forces, showing a reign of terror, characterized by pitched battles between miners and mine guards, with long range and deadly rifles and machine guns, in which numerous persons have been killed and a great many others wounded, and a vast amount of property destroyed. In connection with this, records and papers of the civil authorities are produced, indicating their utter inability to cope with the situation. Summarizing the conditions, the returns say "Respondents are informed and believe and so aver, that public sentiment in Kanawha County is so divided and partisan feeling so universal that it is impossible to procure a jury in said county, as prescribed by law, to impartially try criminal cases against active participants in this industrial struggle. Your respondents are informed and believe and so aver, that approximately thirty thousand shots have been exchanged during the existence of this warfare, that sixteen men are known to have been killed, and your respondents are informed and believe, and so aver, that the actual number of dead will in all probability reach fifty or more." Of the part played by the petitioners in the uprising each of the returns says: "Your respondents are informed and believe, and so aver, that the petitioner has been largely instrumental in causing and encouraging the lawlessness, riot and insurrection now prevalent in the aforesaid territory, and that the detention of the prisoner is in their judgment necessary in order to effectually suppress the lawlessness, insurrection and riot which occasion the proclamation of Martial Law."

The bodies of the petitioners having been produced, the cases were submitted on demurrers to the petitions and motions to quash the same, demurrers to the returns and motions to quash them and general replications. Affidavits of the justice with whom the complaints were filed and by whom the warrants were issued, and the prosecuting attorney of the county,

filed in support of the returns, show that the former, by direction of the latter, ordered the officer by whom the arrest had been made to carry the prisoners into the military district. To show the existence of the grounds upon which the prose‑ cuting attorney gave this direction, he states his knowledge and information as to the lawless conditions prevailing in the military district, the declaration of martial law and, a state of war therein, summarizes many of the matters set forth in the returns, narrates the details of the uprising of February 7, 1913, in the course of which Vance and Bobbitt were killed, and gives it as his belief and opinion that the military com‑ mission has jurisdiction of the offense with which the parties are charged, and also that justice cannot be administered to them in the civil courts of the county, because of inability to obtain the testimony of the witnesses, since they reside in the military district where lawlessness obtains, producing a state of fear and intimidation. As to this point, the affidavit says: "Martial law has been three times declared in portions of said county; * * owing to the terror and intimidation created by this state of affairs, practically without exception it has been impossible during all of the period aforesaid to secure the apprehension and indictment of the guilty parties in any of these crimes, even in the periods when martial law did not prevail; * * while the lawlessness and crimes have been principally, though not entirely, confined to the district now under martial law, the disturbance thereof has extended to other parts of the county to such an extent that the civil courts have been and are virtually closed for the punishment of crimes committed in the district now under martial law." An affidavit of the sheriff of the county, filed, contains the follow‑ ing: "Affiant has read the affidavit of T. C. Townsend, and concurs in the statement therein contained of the lawless‑ ness and disorder and conditions generally prevailing in said county during many months past, and in the opinion of said Townsend that for the reasons stated in said affidavit it has been and is impossible to administer justice in the civil courts to persons for offenses committeed in the district now under martial law, and that the civil courts are virtually closed for the punishment of crimes which have been committed in said

district during the disturbances mentioned in the affidavit of said Townsend." An affidavit of Ira Mottesheard, Clerk of the Circuit and Intermediate Courts of Kanawha County, filed by the petitioners, says that so far as affiant knows the writs and process of said courts have not been obstructed or the service of the same prevented or hindered in any part of the said county; that at the present time he has no knowledge of any obstruction of the service of the process of the said court; that both of said courts have, during the entire time he has served as such clerk, regularly convened as provided by law at the court house of said county in the City of Charleston; that at no time has it been interrupted or impeded by any act of violence, rioting or other cause in any part of said county, and that at the date of the affidavit the courts were in session at the court house of said county and wholly unobstructed in their proceedings. An affidavit of the same officer, filed by the respondents says that immediately preceding or during the time martial law has been in effect, in so far as he recalls, that no writs of any kind or character were issued by the courts of which he is clerk directed to be served within the territory covered by martial law.

*A. M. Belcher* and *H. W. Houston,* for petitioners.

*Wm. G. Conley,* Attorney General, *J. O. Henson,* Assistant Attorney General, *George S. Wallace, Brown, Jackson & Knight* and *Price, Smith, Spilman & Clay,* for respondents.

POFFENBARGER, PRESIDENT:

Except in so far as they pertain to the arrest of the petitioners outside of the military district and their conveyance into it, the affidavits filed relate to conditions and circumstances relied upon as justification of the declaration of a state of war in the military district, and the argument for the most part deals with the main questions disposed of in *Ex parte Nance and Mays,* recently decided by this Court. Here, as in those cases, certain constitutional provisions are relied upon as authority for the position that, in the exercise of the constitutional and statutory power to suppress insurrection and repel invasion, the governor cannot declare a state of war and apply

military rule, and that citizens arrested in the exercise of that power must be immediately turned over to the civil authorities for inquiry as to their guilt of the offenses of which they are accused and for trial by the civil courts, when there is probable cause to believe them guilty.

Nance and Mays had been tried by a military commission for offenses committed within the military zone and sentenced to terms in the penitentiary and they sought liberation by writs of *habeas corpus*. To the extent of the claim of right in the governor to imprison them, pending the proceedings to suppress the insurrection, the court sustained him. The conclusion is summarized in the following terms: "Our present inquiry goes only to the legality of the custody of the respondents at the present time and under the existing conditions. The territory in which the offenses were committed is still under martial rule. It suffices here to say whether the imprisonment is, under present conditions, authorized by law, and we think it is. We are not called upon to say whether the end of the reign of martial law in the territory in question will terminate the sentences. Upon that question we express no opinion." As a premise to this conclusion, the power of the governor to declare a state of war, to use the military forces to suppress insurrection or rebellion or repel invasion, and to establish a military commission for the punishment of offenses committed within the military zone and by its judgment impose imprisonment, notwithstanding the constitutional guaranty of subordination of the military to the civil power, the privilege of the writ of *habeas corpus* and the right of trial by jury in the civil courts for offenses cognizable by them, and the conclusiveness of the executive declaration of a state of war, were asserted. The power and authority of the court to interfere with the executive arm under such circumstances was denied. We also held and asserted this right and power in the executive as to a city, district or county of a state, notwithstanding the courts were open and sitting in other portions of the county. But there was no attempt in the opinion filed in these cases to define or enumerate the offenses cognizable by the military commission or the extent of the punishments it may inflict. We were careful to say there were limits beyond which the executive could not go

without subjecting himself or his officers and men to rights of action for damages on the restoration of peace and tranquility. We marked the distinction between executive power and the possibility of wrong doing in the exercise thereof.

A re-examination of the opinion in those cases in the light of further argument and additional authorities consulted, has developed no reason or cause for departing from the conclusions and principles there announced. On the contrary our impression as to the basic principles of that decision has been strengthened and confirmed. Considering the Constitution as a whole and endeavoring to give effect to all of its parts, we asserted power to set aside and ignore, to some extent, in the suppression of an insurrection, ordinary judicial process and remedies. The provisions of our Constitution relied upon as being inconsistent with this conclusion are perhaps no broader nor more positive in their terms than some of those of the federal Constitution, binding on the state courts as well as the federal. Power in the federal government to establish military rule and martial law over citizens as well as persons belonging to its land and naval forces and the militia engaged in its service, in enemy territory, whether in a foreign country or in sections of the Union in a state of insurrection or rebellion, is established beyond question.

During the occupation of the city of New Orleans by the military authorities and forces in the late war, General Dow was sued in a municipal court by one Bradish Johnson for the value of certain property, twenty-five hogsheads of sugar, a silver pitcher, half a dozen silver knives, and other table ware, taken by Captain Snell's company under the command of General Dow. The defendant did not appear nor make any defense and there was a judgment against him by default. After the war, a suit was brought on this judgment in the Circuit Court of the United States for the district of Maine and the question of the validity of that judgment was certified to the Supreme Court of the United States. The court held that the state court had no jurisdiction of the cause of action, and that the judgment was void. Delivering the opinion of the Court, Mr. Justice Field said: "This doctrine of non-liability to the tribunals of the invaded country for acts of warfare

is as applicable to members of the confederate army, when
in Pennsylvania, as to members of the national army when
in the insurgent states.    The officers or soldiers of  neither
army could be called to account civilly or criminally in these
tribunals for such acts, whether those acts resulted   in   the
destruction of property or the destruction of life; nor could
they be required by those tribunals to explain or justify their
conduct upon any averment of the injured party that the acts
complained of were unauthorized by the necessities   of   war.
*   *   *      *   We fully agree with the presiding justices of
the Circuit Court in the doctrine that the   military   should
always be kept in subjection to the laws of the country to which
it belongs, and that he° is no friend to the republic who advo-
cates the contrary.   The established principle of   every   free
people is, that the law shall alone govern; and to it the mili-
tary must always yield.   We do not controvert the doctrine  of
*Mitchell* v. *Harmony,* reported in 13 Howard; on the contrary,
we approve it.   But it has no application to the case at   bar.
The trading for which the seizure was there made had   been
permitted by the Executive Department of our   government.
The question here is, What is the law which governs an army
invading an enemy's country?   It is not the civil law of the
invaded country; it is not the civil law  of  the  conquering
country: it is military law,—the law of war,—and its suprem-
acy for the protection of the officers and soldiers of the army,
when in service in the field in the enemy's country, is as essen-
tial to the efficiency of the army as supremacy of the civil
law at home and in time of peace, is essential to the preserva-
tion of liberty."    .

In *United States* v. *Diekelman,* 92 U. S. 520, Mr.   Chief
Justice Waite, speaking of Diekelman, commander of a for-
eign vessel, suing for damages on account of   detention   by
General Butler in the port of New Orleans, said: "When he
entered the port, therefore, with his vessel, under the special
license of the proclamation, he became entitled to all the rights
and privileges that would have been accorded to a loyal citizen
of the United States under the same circumstances, but no
more.    Such restrictions as   were   placed   upon   citizens,
operated equally upon him.    Citizens were governed by mar-

tial law. It was his duty to submit to the same authority. Martial law is the law of miltary necessity in the actual presence of war. It is administered by the general of the army, and is in fact his will. Of necessity it is arbitrary; but it must be obeyed. New Orleans was at this time the theater of the most active and important military operations. The civil authority was overthrown. General Butler, in command, was the military ruler. His will was law, and necessarily so." *Dow* v. *Johnson,* cited, shows that then the municipal courts of New Orleans were open by permission of the commanding general. In *Dooley* v. *United States,* 182 U. S. 222, Mr. Justice Brown quoted with approval the following from Halleck in his work on International Law: "The right of one belligerent to occupy and govern the territory of the enemy while in its military possession, is one of the incidents of war, and flows directly from the right to conquer. We, therefore, do not look to the Constitution or political institutions of the conqueror, for authority to establish a government for the territory of the enemy in possession, during its military occupation, nor for the rules by which the powers of such government are regulated and limited. Such authority and such rules are derived directly from the laws of war, as established by the usage of the world, and confirmed by the writings of publicists and decisions of courts—in fine, from the law of the nations. * * * The municipal laws of a conquered territory, or the laws which regulate private rights, continue in force during military occupation, except so far as they are suspended or changed by the acts of the conqueror. * * * He, nevertheless, has all the powers of a *de facto* government, and can at his pleasure either change the existing laws or make new ones." This was said of an American military commander operating in the Island of Porto Rico during the Spanish-American war. The same court, in *New Orleans* v. *Steamship Co.,* 20 Wall. 387, declares the same law applicable in domestic territory in a state of rebellion. Of the power of the military government over the city of New Orleans, after this conquest, the court said the military government had "the same power and rights in territory held by conquest as if the territory had belonged to a foreign country and had been subjugated in a foreign war.

In such cases the conquering power has the right to displace the pre-existing authority, and to assume to such extent as it may deem proper the exercise by itself of all the powers and functions of government. It may appoint all the necessary officers and clothe them with designated powers, larger or smaller, according to its pleasure. It may prescribe revenues to be paid, and apply them to its own use or otherwise. It may do anything necessary to strengthen itself and weaken the enemy. There is no limit to the powers that may be exerted in such cases, save those which are found in the laws and usages of war. These principles have the sanction of all publicists who have considered the subject." This enunciation of principles was quoted by Mr. Justice Brown and approved by the United States Supreme Court in *Dooley* v. *United States* as late as the year 1900.

"Martial law is the temporary government and control by military authority of territory in which, by reason of war or public disturbance, the civil government is inadequate to the preservation of order and the enforcement of law." 40 Cyc. 387. "The proclamation of martial law establishes the will of the military commander as the rule of authority. His will, however, is not to be arbitrarily exercised, and it usually supersedes the local law only so far as necessary for the preservation of order, and, in case of invasion, the supremacy of the conqueror." 40 Cyc. 390. The article from which these quotations are made was prepared as late as 1912 by George Grafton Wilson, Professor of International Law in Harvard University, Lecturer on International Law in Brown University and in the United States Naval War College. Of the duration of martial law, he said: "The duration of martial law is determined by the necessity which led to its establishment, and it therefore ceases as soon as the civil authorities are able to resume the unobstructed exercise of their ordinary functions." 40 Cyc. 319.

In the great contests in England over the interpretation of the unwritten constitution and to maintain its integrity and guaranties, this principle was admitted by the stoutest and most radical of the opponents to royal aggression and encroachment. Hear the admission of Mr. St. John, counsel for John

Hampden, in the *Ship Money Cases:* "My Lords, from this Objection of sudden Danger, I come to the next, which is the third thing being offered unto your lordships, which is an admittance, that the danger may sometimes be such, that the Subject's goods sometimes without their consent may be taken from them; for Property being both introduced and maintained by human laws, all things by the law of nature being common, there are therefore some times, like the Philistines being upon Sampson, wherein these cords are too weak to hold us. *'Necessitae enim'* (as Cicero saith) *'magnum humanae imbecilliatis omnem legem frangit;'* at such times all property ceaseth, and all things are again resolved into the common principles of nature." State Trials, Vol. III., p. 903. Likewise Sir Edward Littleton for the King, p. 959: "In the next place, they say, if the king be in the field with his banners displayed; this they say was *tempus belli.* Cannot the courts of justice sit then, but there must be a peace? 39 Ed. 3 Rot. 10 Did not the court of justice sit then? Our ordinary printed books show what causes of law then were. And in Henry 6's time, in all our civil wars, and in Henry the 7's time, they sat then. But the true time, to make it *tempus belli,* is to make a war against the king." Then the admission of Mr. Holborne, on behalf of Mr. Hampden, p. 975: "Now in times of necessity, there is a law that doth compel; nay, there is a stronger penalty than our laws can imagine; for our laws can make but a penalty of all that you have; but How? To the King. But when there is a danger from an enemy there is not only a danger of losing all that one hath, but of losing lives and lands, and all that we have; and all into the hands of the enemy." Sir George Crooke, justice of the Kings Bench, delivering his opinion in favor of Hampden and against the King, said, p. 1162: "Royal power, I account, is to be used in cases of necessity, and imminent danger, when ordinary courses will not avail; for it is a rule, *'Non occurrendum est ad extraordinaria, quanda fieri potest per ordinaria;'* as in cases of rebellion, sudden invasion, and some other cases, where martial law may be used, and may not stay for legal proceedings. But in a time of peace, and no extreme necessity, legal courses must be used, and not royal power." Likewise Sir Richard

Hutton of the Court of Common Pleas, resolving against the King, p. 1198 : "For I do agree in the time of war, when there is an enemy in the field, the king may take goods from the subject; such a danger, and such a necessity, ought to be in this case, as in case of a fire like to consume all  without speedy help, such a danger as tends to the overthrow of the kingdom." Sir Humphrey Davenport, also advising in favor of Hampden, said, pp. 1214, 1215 : "I hold it real, that when any part of the kingdom is in danger, actually in danger, or in expectancy of danger, and the same expressed by his  writ; I agree, the king may charge the subjects without parliament, towards the defence thereof; for 'necessitas est lex  temporis,' in vain to call for help when the enemy is landed.   Clearly I hold the king to be the sole judge of the danger : And the danger being certified by his majesty, I hold it not traversable; and in such a case he may charge the subject without parliament, so that the very cause be effectually expressed upon the records, that the kingdom was in danger."

An observation in Dicey's Law of The Constitution, a recent work by an English author, at page 289, seems to deny  such power to the British Sovereign in England only, not elsewhere in the kingdom, and cites as authority *Wolfe Tone's Case,* 27 St. Tr. 614. Tone was sentenced to death in Ireland by a military commission, and committed suicide before arrival of the time of execution. On the day set for execution, and before Tone died, Mr. Curran, his attorney, appeared in the Kings Bench, and applied for a writ of *habeas corpus,* which, being granted, was ignored by the military officers. In applying for the writ, Mr. Curran said, p. 625 : "In times when war was raging, when man was opposed to man  in the field, courts martial might be endured; but every law authority is with me, while I stand upon this sacred and immutable  principle of the constitution—*that martial law and civil law are incompatible;* and that the former must cease with the existence of the latter." *Tone's Case* was like that of *Milligan,* 4 Wall. 2. There was then no actual war, nor proclamation thereof, in Ireland. Tone had been captured at sea in a French  vessel, bound for Ireland on an expedition of invasion.   By some authorities, *Wall's Case,* 28 St. Tr. 51, is relied upon as being

against the proposition laid down by the federal Supreme Court. As commander of a garrison on the Island of Goree on the African coast, Wall had caused a soldier of his garrison to be beaten to death. That man's rights were governed by the general civil law and the British statutes, relating to discipline of the army. His rights were invaded in neither a time nor a place of war. Wall was convicted of murder on an issue as to whether he had acted in good faith under belief of the existence of a mutiny, headed by his victim, or on a mere pretext and with malice.

But Mr. Dicey does not in fact deny the proposition. On the contrary, he admits it, and cautions the student against the danger of being misled by non-observance of the different senses in which the term "martial law" is used. See page 284. He says martial law in the proper sense is unknown to the law in England. Page 283. Then he says: "Martial law is sometimes employed as a name for the common law right of the Crown and its servants to repel force by force in the case of invasion, insurrection, riot, or generally of any violent resistance to the law. This right, or power, is essential to the very existence of orderly government, and is most assuredly recognized in the most ample manner by the law of England." Page 284. Thus we find Mr. Dicey is merely denying the right of martial or military rule over citizens outside of the theatre of actual war and admitting its existence in the war zone, just as do Judge Advocate General Leiber, Prof. Ballantine and other writers on the subject, as will be hereinafter shown. He is distinguishing the war power of government from the peace power.

No doubt Patrick Henry and Thomas Jefferson were familiar with the British Constitution and had carefully studied Magna Charta and the Petition of Right. They were, too, apostles of liberty as well as constitutional lawyers. The former ceased to be Governor of Virginia June 1, 1779, and the latter on that day, became governor, and held the office until June 12, 1781. While he was Governor and no doubt potential as to the course of legislation as in other respects, the General Assembly, in May, 1780, passed an act containing the following provision: *"Be it enacted,* That the governor be

authorized, with advice of council, and he is hereby authorized and empowered, with such advice, to commit to close confinement, any person or persons whatsoever, whom there may be just cause to suspect of disaffection to the independence of the United States, and of attachment to their enemies; or to cause any such person to be removed to such places of security as may best guard against the effects of their influence and arts to injure this community, and benefit the common enemy. *And be it further enacted,* That in case of any insurrection within this commonwealth, or the same shall be invaded by the enemy, either by land or water, that all and every person or persons within the same, who shall act as guides to, or spies for them, or who shall furnish the enemy with provisions or other necessaries; or who shall encourage desertion from the army, or who shall dissuade or discourage the militia from opposing the enemy, or who shall give intelligence, aid, or comfort to the enemy, shall, and they are hereby declared to be subject to the law martial as declared by congress on the twentieth day of September one thousand seven hundred and seventy-six, in the fourth article of the sixth section, and the eighteenth and nineteenth articles of the thirteenth section of the continental articles of war. And that for the trial of such offenders, a court-martial, to consist of not fewer than thirteen commissioned officers, one of whom shall be a field officer, shall be called by the county lieutenant or commanding officer of the militia in the county where such offence shall be committed, or in any other county of this commonwealth, where such offender may be found." 10 Hen. Stat. at L. 310.

In May, 1781, while Jefferson was governor, an act was passed, containing this provision: "The governor, with advice of the council, is also hereby empowered to apprehend or cause to be apprehended and committed to close confinement, any person or persons whatsoever, whom they may have just cause to suspect of disaffection to the independence of the United States or of attachment to their enemies, and such person or persons shall not be set at liberty by bail, mainprize or *habeas corpus.*" 10 Hen. Stat. at L. 414.

To say there cannot be a trial by a military commission under martial rule is a contradiction of authority everywhere.

"Military commissions are courts organized under the inter-national law of war for the trial of offenses committed during war by persons not in the land or naval forces.   In  the United States their jurisdiction is confined to enemy territory occupied by an invading army, or at least to those sections of the country which are properly subject to martial law, and their authority ceases with the end of the war." 40 Cyc. 391. "By a practice dating from 1847 and renewed and firmly estab-lished during the Civil War, military commissions have become adopted as authorized tribunals in this country in time of war. They are simply criminal war courts, resorted to for the reason that the jurisdiction of courts-martial, creatures as they are of statute, is restricted by law, and can not be extended to include certain classes of offenses which in war would go unpunished in the absence of a · provisional forum for the trial  of  the offenders.  Their authority is derived from the law of war, though in some cases their powers have been added to by stat-ute.   Their competency has been recognized not only in acts ´of Congress, but in executive proclamations, in rulings of the courts, and in the opinions´ of Attorney Generals.   During the Civil War they were employed in several thousand cases; more recently they were resorted to under the 'Reconstruction' act of 1867; and still later one of these courts has been convened for the trial of Indians as offenders against the laws of war." Digest of Opinions of the Judge-Advocate General of the Army by Howland, p. 1066.  "The jurisdiction of a military com-mission is derived primarily and mainly from the law of war; but special authority has in some cases been devolved upon it by express legislation, as has already been noticed.   Military commissions are authorized by the laws of war to exercise juris-diction over two classes of  offenses,  committed,  whether  by civilians or miltary persons, either (1) in the enemy's country during its occupation by our army and while it remains under military government, or (2) in the locality not within  the enemy's country or necessarily within the theater of war, in which martial law has been established by competent authority. The classes of offenses are (1) ·violation of the laws of  war. (2) Civil crimes which, because the civil authority is super-seded by the military, and the civil courts are closed or their

functions suspended, cannot be taken cognizance of by the ordinary tribunal. In other words, the military commission, besides exercising under the laws of war its jurisdiction of offenses peculiar to war, may act also as a substitute for the time for the regular criminal adjudication of the state or district." Dig. Opin. Judge-Adv. Gen. sec. 1680, McClure. "Of the ordinary crimes taken cognizance of under similar circumstances by these tribunals, the most frequent were homicides, and after these, robbery, aggravated assault and battery, larceny, receiving stolen property, rape, arson, burglary, riot, breach of the peace, attempt to bribe public officers, embezzlement and misappropriation of public money or property, defrauding or attempting to defraud the United States. * * * Not unfrequently the crime, as charged and found, was a combination of the two species of offenses above indicated. As in the case of the alleged killing, by shooting or unwarrantably harsh treatment, of officers or soldiers, after they had surrendered, or while they were held in confinement as prisoners of war; of which offenses persons were in several cases during the Civil War convicted by military commissions under the charge of 'murder, in violation of the laws of war.' " Dig. Opin. J.-Adv. Gen., Howland, p. 1701. See also McClure's Dig. J.-Adv. Gen. Opin. secs. 1680, 1681, 1682, 1683, 1684. A military commission may sit and act in a community in which the civil courts are also acting. "From the jurisdiction, however, of military commissions under the circumstances above indicated, are properly excepted such offenses as are within the legal cognizance of the ordinary criminal courts, when, upon the establishing of military government or of the *status* of martial law, such courts have been, by express designation or in fact, left in full operation and possession of their usual powers. Thus, during the considerable periods of the war, pending which the District of Columbia was practically placed under a mild form of martial law, ordinary criminal offenses committed therein by civilians or miltary persons, of which there was not expressly vested by statute a jurisdiction in military courts concurrent with that of the civil tribunals, were in general allowed to be taken cognizance of by the latter, the same being at no time seriously interrupted in the exercise

of their judicial functions."      McClure's Dig. J.-Adv. Gen. Opin. sec. 1685. Though a military commission is a military court, its jurisdiction is not confined to military persons. It extends to citizens as well as soldiers. That citizens may be brought within the exercise of their power is revealed by the reason for their constitution. Courts-martial do not extend to citizens. As, in the exercise of military government, it often becomes necessary to rule, govern and punish citizens and the powers of courts-martial established by law, not by the will of the commander, do not reach such cases, a military commission to deal with citizens in the war area, is necessary. The general orders issued during the Civil War contained nearly 150 case of women who were tried by military commissions. Dig. J.-Adv. Gen. Howland, p. 1067, note 6. Of course they were not soldiers or in any way included in the land and naval forces of the United States or the militia.

"Although there is no express provision of the Constitution or Acts of Congress authorizing military commissions, yet such commissions are tribunals now as well known and recognized in the laws of the United States as the court-martial. They have been repeatedly recognized by the executive, legislative, and judicial departments of the government as tribunals for the trial of military offenses. But while military commissions are thus recognized, such a commission is not a court within the meaning of the fourteenth section of the Judiciary Act of 1789, nor is the authority exercised by it judicial in the sense in which judicial power is granted to the United States. A military commission, unlike a court-martial, is exclusively a war court; that is, it may legally be convened and assume jurisdiction only in time of war or of martial law or military government when the civil authority is suspended. Its Jurisdiction is ordinarily limited to the theatre of war or of military occupation. Its jurisdiction extends to persons connected with the army of the enemy, acting as spies or violating the rules of war; to the inhabitants of the enemy's country held by an army of occupation; to the inhabitants of places under martial law; and to members of the army of the United States, or civilians serving it in the field, who have committed offenses not within the jurisdiction of a court-martial. The

offenses cognizable by such a tribunal comprise violations of
the laws and usages of war, breaches of military orders    or
regulations not within the judisdiction of courts-martial, and
criminal offenses cognizable by the ordinary criminal courts
and which would be tried by such courts if unobstructed in
the exercise of their jurisdiction." 20 A. & E. Enc. L. 660-
661. Military commissions are courts organized under    the
international law of war for the trial of offenses committed
during war by persons not in the land or naval forces.   In the
United States their jurisdiction is confined to enemy territory
occupied by an invading army, or at least to those sections of
the country which are properly subject to martial law." 40
Cyc. 391.

Against such judicial  construction   and . declarations  of
power, the speculations of lawyers  and  publicists, when  in
conflict with them, avail nothing; but, as we endeavored to
show, in the opinion in the former cases, there is no such con-
flict; or, at least, very little. We repeat that General Leiber
and Professor Ballantine, relied upon as such authority,  in
their two articles referred to in the decision in the Nance and
Mays cases, clearly mark the distinction  between   executive
power in the area of military operation and in pacific territory.
Of the case of *Luther* v. *Borden,* cited as authority  in  the
Moyer case, as late as the year 1908, for power in the executive
of a state to declare a state of war and thereby set aside judi-
cial power, General Leiber said: "When the legislature  of
Rhode Island made use of it in 1842 it was probably intended
to have no more definite meaning than that the militia of
the State was to use its military power to suppress the enemies
of the State.  It was an authorization to do what was  done
when the military officer broke into the house of one of  the
enemies of the State in order to arrest him.  He was a public
enemy against whom the military power had been called out.
It is evident that this is not the kind of martial law which we
have been discussing." The purpose of his article  was  to
define the powers of the executive in the use of the military
forces outside of the war zone and in territory considered loyal
as contradistinguished from the territory of the public enemy.
Professor Ballantine, after having discussed the subject of such

power, "In Time of Peace", and endeavored to define its limits, passes to the second division of his article, executive power "In Time Of War," and then proceeds as follows: "The question remains whether we may have federal martial law by virtue of the "War Power" during invasion or insurrection in domestic territory. In war the enemy, be he a foreign one or a rebel to whom the status of belligerent has been given, has no legal rights which the invader must respect except those which international law recognizes. When a civil contest becomes a public war, all persons living within hostile limits become *ipso facto* enemies by their residence in enemy territory. An army in the enemy's country is thus governed by the law of war, and officers and soldiers are responsible only to their own government." Having said this he immediately returned to the status of citizens in domestic territory outside of the rebellious area, saying "But in domestic territory the status of the army is entirely different. The civil rights of citizens are not suspended but remain the same as in peace, both in districts near to and remote from the theatre of actual warfare." Observe that he does not say "remain the same in the theatre of actual warfare." His next observation is that "The occurrence of hostilities does not vary the position of the citizen or deprive him of the protection of the Constitution, unless the army is in the position of a foreign invader and the country is ruled from without, acquiring the status of enemy territory." Then he cites *Dow* v. *Johnson,* 100 U. S. 158. He is still talking of the rights of citizens outside of the war zone, but *Dow* v. *Johnson* expressly decides that the rebellious territory is enemy territory and subject to military rule. Obviously he cites this only as marking the difference between executive power in the theatre of war in an instance of rebellion and executive power in the same country outside of the theatre of war. His criticism of the admission in *Ex parte Milligan* that, in time of war, there may be occasions when martial law can be properly applied, and of the decision of the English Privy Council, in a recent case, *Ex parle D. F. Marias,* is not authority against the position here taken. In this, he states what *he thinks* *ought to be the law, but admits that it is not the law.* Thus he says *Ex Parte Milligan* declares that military authority of

necessity supersedes the civil authority in foreign invasion or civil war on the theatre of active military operations; and also that, in the late British-Boer war, the English Privy Council rendered a decision, holding the fact that some tribunals had been permitted to pursue their ordinary course was not conclusive that war was not raging.

For his position, in so far as it seems to conflict with the admitted authority against it, he cites *Mitchell* v. *Harmony*, 13 How. 115. That was an action for a wrong done by a military officer in the exercise of military power and authority in foreign territory, Mexico, in time of actual war. The action was brought long after the war had closed and in the courts of the United States, and the decision asserts no more than that military officers are liable for wrongs done in the exercise of military power, and that they are governed and limited in respect to the acts they may do by the usages of war as understood in international law. The case is no authority for the position that the courts may supersede or arrest the executive arm of the government while engaged in the conduct of a war of invasion or the suppression of an insurrection or rebellion, and here again, it would be unjust to him to read his criticism of the *Milligan Case* as the assertion of such a claim. He means no more than that, on the theatre of war, power cannot be exercized beyond that allowed by the usages of civilized warfare, and that, after the return of the army from its foreign war, or the restoration of peace, an officer acting in violation thereof may be civilly or criminally liable. He neither says nor intimates, nor does his language imply, that the civil courts may give redress in any form, or exercise any power, in the enemy country, and *Dow* v. *Johnson,* cited by him, expressly denies any such power in any court of any country.

Stating in his conclusion what *the law is, not what he thinks it ought to be,* he says: "Where the army is not invading enemy territory of a recognized belligerent, but is in its own territory, the military authorities remain liable to be called to account either in *habeas corpus* or any other judicial proceeding for excess of authority toward citizens, no matter whether it occurred in propinquity to the field of actual hostilities or while

the courts were closed, or after a proclamation of Martial Law." Propinquity means not in the field of actual hostilities, but nearness to it or in the neighborhood of it, and his stated premise to the conclusion is "Where the army is not invading enemy territory of a recognized belligerent." In seeking his meaning, we cannot cut this out. To do so would be unjust to him. It would make him say what he neither says nor means.

In support of the denial of the existence of executive power, admitted and asserted by the foregoing authorities, numerous inapplicable decisions are cited, some of which were analyzed and explained in the opinion in the *Nance* and *Mays Cases.* The *Milligan Case,* 4 Wall. 2, involved the rights of a man residing and arrested in a state and county in which there was no war and had not been, and in which the courts were not only sitting, but absolutely unobstructed in the exercise of their powers. In his argument in that case, Mr. Garfield marked the distinction between the sections, the war area and in the pacific domain. After having shown what provision Congress had made for arrest, detention and trial of disloyal people found in pacific territory, he said: "But Congress did far more than to provide for a case like this. Throughout the eleven rebellious States, it clothed the military department with supreme power and authority. State constitutions and laws, the decrees and edicts of courts, were all superseded by the laws of war." If the Constitution of the United States forbade supremacy of the military over the civil power, in every part of the national dominion, no matter what its condition, and thus effectually precluded supremacy of military power as is contended, the Congress of the United States could not have done what Mr. Garfield said it did in the eleven rebellious states. Congress can no more override the Constitution than the president can. He admits that such executive power was exercised in those states and then, showing the state of Indiana to have been pacific territory, lying wholly outside of the theatre of war, he denied the existence of any act of Congress authorizing a trial, by military commission, of a citizen, residing and arrested outside of the war area. Moreover, the entire Supreme Court, its dissenting justices as well

as the others, declared that Congress had not authorized the application of martial law to a state like that of Indiana, nor attempted to do so.    Chief Justice Chase, for the minority of the court, said: "We have confined ourselves to the question of power.    It was for Congress to determine the question of expediency.    And Congress did determine it.    *That body did not see fit to authorize trials by military commission in Indiana, but by the strongest implication prohibited them."* Mr. Justice Davis, delivering the majority opinion, said: "It is not pretended that the commission was a court ordained by Congress. * * But it is said the jurisdiction is complete under the laws and usages of war.    * *    They can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed."    As Indiana was not in a state of actual war, nor under a military government by proclamation, authorized by Congress, it is clear that the *Milligan Case* is no authority against the exercise of executive power in territory legally declared to be in a state of war.    *In re Kemp,* 16 Wis. 382, is governed by exactly the same principles.    So is *Ex parte Merryman,* 17 Fed. Cas. No. 9487.    *In re Henderson,* 11 Fed. Cas. No. 6349, involves the question whether a mere contractor to furnish supplies to the government for the use of the military service shall be tried by court-martial.    It is not contended that any of the elements justifying substitution of the military for civil government were present.    Hence the case has no possible application to the question here under consideration.    The nature of the *Egan Case,* 5 Blatch.  319, appears from the statement found in the syllabus: "Where a person was tried by a Military Commission, in South Carolina, in November, 1865, for a murder committed in September, 1865, and was convicted and sentenced to imprisonment for life in the Penitentiary at Albany, New York, hostilities having terminated and the rebel army having surrendered to the authorities of the United States some seven months before the trial: *Held,* on a *habeas corpus* that the prisoner was entitled to be discharged on the ground that the conviction was illegal, for want of jurisdiction in the tribunal."    In the opinion of the court, there was not, at the time of the trial and

conviction, a state of war in the community in which it occurred. *Johnson* v. *Jones,* 44 Ill. 142, as regards the situation of the prisoner, was like that of the *Milligan Case.* He had been arrested and resided in pacific territory.    In *Johnson* v. *Duncan,* 6 Am. Dec. 776, the validity of a proclamation of martial law was denied on the ground of lack of authority in the commanding officer to proclaim it, Congress not having conferred it.    The principles of that case is the same as that of the *Merryman Case.    Ela* v. *Smith,* 5 Gray 121, did not arise in a state of war nor under a proclamation thereof.    The mayor of a city merely called upon the volunteer militia to assist him in executing the civil law.    Whether, in case of a rebellion or insurrection, the governor of a state may use the military power for its suppression, and, in doing so, temporarily substitutes military law or rule for the civil law, is neither discussed nor adverted to in the opinion.

It is true that, in Tucker on Constitutions, the exposition of this doctrine by the Supreme Court of the United States is criticized, but the author admits the interpretation is at variance with his views.    Speaking of certain cases in which the court announced its conclusions, at page 639, he says: "It is therefore pertinent to observe in respect to them, that they overthrew existing republican forms of government in every State of the Confederacy, and that government in Virginia which Congress and the President had recognized in the  act dividing the State of Virginia which resulted in the admission of West Virginia to the Union; and the government of Virginia thus recognized was put in possession of power at the city of Richmond after the war as the lawful government of Virginia. The reconstruction laws overthrew that government which Congress itself had set up, and substituted a military government with the judicial power subject to its control.    Military commissions were inaugurated for the trial of citizens in other States, and conventions were called under regulations  prescribed for suffrage by Congress, and new Constitutions were adopted and new forms of government established.    It  is hardly a question that these laws, which overthrew the form of government established by the State, and refused to restore it as the legitimate form of government, and set up a military

despotism in its place, were not a guarantee of a republican form of government to the States, but guaranteed the overthrow of all republican forms of government and the adoption of a Constitution against the will of its people and under the dictation of military power." This criticism necessarily admits all that is claimed in this opinion as to the construction of the federal Constitution by the Supreme Court of the United States, namely, that, in belligerent territory, Congress had the power, in effecting a restoration of the constitutional guarantees, to set up provisionally such a government as in their opinion would ultimately bring about that result. It is testimony to the existence of the law by one who challenges its soundness.

Willoughby on the Constitution, at sections 726 and 727, in speaking of the use of the military under the control and direction of civil officers in the enforcement of a civil law, citing *Ela* v. *Smith,* 5 Gray 121, denies that such use of the military forces constitutes martial rule or military government, and in this may be correct. At sections 728, 729, 730, 731 and 732, he discusses martial law and miltary government. Here he criticizes the opinion of Chief Justice Taney in *Luther* v. *Borden,* and adopts the views of Justice Woodbury in a dissenting opinion. His criticism of the majority opinion necessarily admits conflict between his personal view and that of the Court, in which case, of course, the opinion of the court prevails and must be regarded as law. He also finds fault with the opinion of Mr. Justice Holmes in the case of *Moyer* v. *Peabody,* but here again the views of the court must prevail. Speaking of martial law in time of war, at section 732, he says: "It has already been learned that in war the enemy, be he a foreign one, or a rebel to whom the status of belligerent has been given, has no legal rights which those opposed to him must respect. When a civil contest becomes a public war, all persons living within limits declared to be hostile become *ipso facto* enemies, and subject to treatment as such. * * * Upon the actual scene of war, there is no question but that, for the time being, the military authorities are supreme, and that these may do whatever may be necessary in order that the military operations which are being pursued may succeed. Here martial law becomes indistinguishable from military government.

* * * The necessities being great and extraordinary, the executive and administrative, that is to say, the military, action that will be justified is correspondingly extensive." In section 733, he deals with the rights and powers of the executive and of citizens in time of war, but outside of the war area. Here he classes the *Milligan Case* as we do. Under this head, he says: "Under the stress of military exigency, upon the actual theatre of war such civil guarantees as the writ of *habeas corpus*, immunity from search and seizure, etc., may, of course, be suspended. As to this there is no question. There is, however, a serious question whether, when war exists, these rights may, by legislative act or executive proclamation, be suspended in regions more or less remote from active hostilities. This question was raised and carefully considered in the famous *Milligan Case* in which the Supreme Court was called upon to pass upon the authority of a military commission, during the Civil War, to try and sentence, upon the charge of conspiracy against the United States government, one Milligan, who was not a resident of one of the rebellious states, nor a prisoner of war, nor ever in the military or naval service of the United States, but was at the time of his arrest a citizen of the State of Indiana in which state no hostile military operations were then being conducted."

As the government of the United States is one of enumerated powers, the Tenth Amendment to the Constitution, declaring that "The powers not delegated to the United States, nor prohibited by it to the states, are reserved to the states respectively, or to the people," it was perhaps more difficult to find authority in the President of the United States and in the Congress thereof to suppress a rebellion and, in the exercise thereof the power to establish military government and administer martial law, than it is to find the same power in the executive of a state, to which there is reserved all power not delegated to the national government nor prohibited to the States. The federal Constitution makes the president commander-in-chief of the army and navy and of the militia of the states, when called into service, but he is not authorized by express terms to use the army and navy or militia, at his own volition, to suppress an insurrection or repel an invasion.

That power is conferred upon Congress, but in the most general terms. By clause 15 of section 8 of Article 1, Congress is authorized "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections or repel Invasions". By clause 11 of the same section, it is authorized "To declare War, grant letters of Marque and Reprisal and make Rules for captures on Land and Water." In conferring these powers upon Congress, the imposition of restraint and limitation upon the exercise thereof was carefully avoided, to the end that the power might be exercised efficiently. It is apparent that, in defending its life against a foreign or domestic foe, the government must be left much in the situation of an individual in the exercise of the right of self-defense. On this subject Alexander Hamilton said: "The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. * * * This is one of those truths which to a correct and unprejudiced mind carries its own evidence along with it, and may be obscured, but cannot be made plainer by argument or reasoning. The means ought to be proportioned to the end, the persons from whose agency the attainment of any end is expected, ought to possess the means by which it is to be attained." Federalist No. 23, Mr. Madison expressed the same idea in the following terms: "It is vain to impose constitutional barriers to the impulse of self-preservation. It is worse than in vain, because it plants in the constitution itself necessary usurpations of power." *Id.* No. 41. Likewise, John Adams, speaking long after the formation of the Constitution, said: "All the powers incident to war are, by necessary implication, conferred upon the government of the United States. There are then, in the authority of Congress and of the Executive, two classes of powers, altogether different in their nature and often incompatible with each other, the war power and the peace power. The peace power is limited by regulations and restricted by provisions prescribed within the Constitution itself *The war power is limited only by the laws and usages of nations.* This power is tremendous; it is strictly Constitutional, but it breaks down every barrier so anxiously erected for the protection of

liberty, of property and of life." Thus, in the spirit of the
framers of the Constitution, the Supreme Court of the United
States, spoke, long years after those who had formed it had
passed away. They died before the anticipated exigency arose,
but, when it came, the administrators of government, including
the judicial branch thereof, had no difficulty in finding, in the
Constitution, the war power in all its might and strength, not-
withstanding the express guarantees of life, liberty and
property, trial by jury and others, insisted upon now as pre-
cluding the existence of such implied power. It included
suspension and overthrow of the civil power in the war zone,
courts or no courts, ignored the constitutional guaranties, sub-
ordinated private right to the exigencies of the occasion, justi-
fied the arrest and imprisonment of. citizens and substituted
military commissions for constitutional civil courts, with
power to try, convict and punish citizens for offenses of all
kinds.

Since the federal Constitution has not inhibited military
government on the theatre of warfare in which the military
power of the federal government is engaged, such government
being, by necessary implication, contemplated and authorized
by the Constitution itself, under such circumstances, no reason
is perceived, nor has any been advanced in the argument of
this case or any other, why military government in a state,
justifiable upon the same ground of necessity and by impli-
cation authorized by the state Constitution, should be regarded
as a violation of the federal Constitution. On the contrary,
the federal Supreme Court has itself, on more than one occa-
sion, declared such state action not to be a violation of
the national Constitution, nor of the guaranties of due
process of law, trial by jury and the equal protection of the
laws. Such is the effect of the decision in *Moyer* v. *Peabody,*
212 U. S. 78, saying: "Public danger warrants the substitution
of executive process for judicial process." The substitution,
referred to and held good in that case, was by the executive
of a state under a state constitution. In that case, *Luther* v.
*Borden,* 7 How. 1, in which Chief Justice Taney asserted the
power of a state to declare war, in the suppression of an insur-
rection and for the establishment and maintenance of its

authority, was cited with approval.   Holding the prisoner not
entitled to his discharge on a writ  of  *habeas   corpus,*  the
Supreme Court of Colorado said.: "In reaching this conclusion
we are not unmindful of the argument that a great power is
recognized as being .lodged with the chief executive,  which
might be unlawfully exercised. · · That such power   may   be
abused is no good. reason why it should be   denied.     The
question simply is, does it exist?   If so, then the   governor
cannot be deprived of its exercise.    The prime idea of govern-
ment is that power must be lodged somewhere for the protection
of the commonwealth.   For this purpose laws are enacted and
the authority to execute them must exist, for they are of no
effect unless they are enforced. ·  Neither is power   of   any
avail. unless it is exercised.   Appeals to a possible abuse of
power are often made in public debate.   They are addressed to
popular fears and prejudices, and often given weight in the
public mind to which they are not entitled.   Every government
necessarily includes a grant of power lodged somewhere.    It
would be imbecile without it."  *In re Moyer,* 35 Col. 159, 169.
This declaration of power by a state court was sustained by the
Supreme Court of the United States. .  In *Luther* v. *Borden,*
7 How. 1, Chief Justice Taney said: "And, unquestionably, a
state may use its military power ·to put down an armed insur-
rection too strong to be controlled by the civil authority.   The
power is essential to the preservation of order and free insti-
tutions, and is as necessary to the States of this Union as. to
any other government.   The state itself must determine what
degree of force the crisis demands."   He then said, in sub-
stance, that, if the government of Rhode Island had made a
declaration of martial law, there was "no ground upon which"
the "court could question its  authority."      Proceeding,  he
further observed: "It was a state of war, and the established
government resorted to the rights and usages of war to main-
tain itself and to overcome the unlawful opposition."    This
proposition, the Court approved and applied in *Moyer* v. *Pea-
body, cited.*   Argument against so plain a declaration is neces-
sarily futile.

In the main, state Constitutions are framed on the plan of
that of the federal government, and all of them contain in

some form the same power, right of self preservation, as that
preserved by the federal Constitution. By it, the power is
vested in Congress for execution by the President. In most
of the state constitutions, it is vested in the governor, for some
reason, possibly because the exercise thereof in a state is con-
sidered a matter of less consequence than by the federal govern-
ment, for the reason that no despotic or arbitrary government
can be permanently established in any state, since the federal
Constitution guarantees to every state a republican form of
government, and any attempt by any governor to establish
himself as a dictator in a state would be promptly thwarted by
the exercise of the powers of the federal government. Hence
there is less danger in entrusting such power to a state gov-
ernor than there would be in entrusting it to a president.
Other reasons may be found in a desire to avoid the expense
incident to the convening of the legislature to confer upon the
governor the power to suppress an insurrection or repel an
invasion. Whatever the reason for it, this difference exists,
and the power vested in the governor of this state by the terms
of the Constitution is the same, regarding the maintenance of
a state government, as that vested in Congress by the federal
Constitution, regarding the maintenance of the national govern-
ment. Indeed, it is vested by the use of the same general
terms. In the *Nance* and *Mays Cases,* we said an express grant
of power to use the military forces to suppress insurrection or
repel invasion was a grant of power to suppress insurrection in
the manner in which that has usually been done in other
states, countries and times. So says the federal Supreme
Court of such terms used in the Constitution of Colorado. In
*Moyer* v. *Peabody,* Mr. Justice Holmes said: "That means that
he shall make the ordinary use of the soldiers to that end."

Though harsh and obviously at variance with the spirit of our
institutions, under normal conditions, this principle finds its
counterpart in a general principle of the law, applicable to
lesser matters than the preservation of the government or the
maintenance of the laws of a state. It is, indeed, unfortunate
that men's lives should be sacrificed and inconveniences and
harships imposed, in the exercise of such power, upon non-
combatants, but this is not the only instance in which the

common law recognizes the same principle.   If a citizen is assailed by another with felonious intent, he may defend himself, to the extent of taking the life of the assailant and the act is justifiable.   Any citizen is authorized by the common law to take upon himself, if the occasion justifies it, the vindication of the law and take the life of another to prevent him from committing a felony.   Here a private citizen is authorized to exercise power the same in character and kind, to save another individual or his property, as that vested in the governor of the state.   As the law admittedly authorizes any citizen, no matter what his character or station in life or the degree of his intelligence, to take life to prevent the commission of a felony, is it inconsistent to say the governor of a state, as the chief conservator of the peace, selected as such for his superior wisdom, character and intelligence, may exercise the same kind of power for the accomplishment of a higher purpose?   Officers of the law, such as constables and sheriffs, in the execution of process for arrest and imprisonment, may oppose resistance, using such force as is necessary, even to the taking  of  life. Whar. Crim L. (11th ed.), sec. 528, p. 718; Murphy on Sheriffs, secs. 1160 and 1129; McClain on Crim. L., sec. 298.   So, in pursuing a felon or preventing an escape, an officer may kill if necessary.   Whar. Crim. L., secs. 532, 533.   If officers of the law, when engaged in the preservation of the peace, find it necessary to take life, such homicide is justifiable.   *Id.* sec. 534.   In all these instances, citizens are  deprived  of  life without a trial by jury,  notwithstanding  the  constitutional inhibition of deprivation of life without a trial by jury.   Likewise there are many instances in which a man may be deprived of his property without a jury trial, notwithstanding a similar constitutional inhibition.   Property of a citizen may be taken out of his possession by the drastic remedy  of  attachment. Though he may have a trial by jury as to the existence of the debt for which the attachment is issued, and as  to  the existence of the grounds thereof, the property is first  taken out of his possession.   He is deprived of the use of it and this amounts to a deprivation of property, without a trial by jury. So there are numerous instances in which jurisdiction of causes involving title to property is vested in the courts of equity, not

bound to give a trial by jury at all. Throughout all this broad country men are arrested and committed to prison by justices, police magistrates and other authorities, daily and by thousands, on accusations of all sorts of offenses, and thus in a sense deprived of their liberties, without the intervention of juries, notwithstanding the constitutional inhibition of deprivation of liberty without a trial by jury. There is no exception of these cases from the letter of the guaranty in terms or by name, yet everybody recognizes it. These illustrations show conclusively that the constitutional guaranties are to be read and applied in the light of their purpose, which falls far short of the letter. They prove beyond question that there are exceptions from the strict letter of those guaranties. As these undoubtedly exist, may not others also? Their existence absolutely and emphatically condemns the theory of strict adherence to the letter of these constitutional provisions. As a citizen may take into his own hands the whole power of the law, as its champion and defender, and take life, to prevent the consummation of a single threatened felony, as well as to save his own life, or merely to prevent great bodily harm, as a matter of self defense, and a petty officer, in effecting an arrest or pursuing a felon, may take life, all single instances and matters of comparatively small moment, notwithstanding the literal guaranties of the Constitution from which they are not expressly excepted, does not the assertion of power in the executive of a state, its chief conservator of the peace, to use military power as a substitute for the civil power, when the whole fabric of government of the state is endangered, the laws trampled under foot, all the constitutional guaranties violated and set aside, the lives and property of thousands in jeopardy, and the civil authorities wholly unable to cope with or resist the assault, stand upon the same principle of necessity? The Constitution does not set it all out in detail, but it uses terms broad enough to include it, unless restrained by the clauses relied upon as imposing such restraint. Neither does the Constitution preserve in terms the right of self-defense or the right to kill in prevention of felonies or arrest of a felon or prevention of his escape, but it uses terms broad enough to include these rights. In both cases, the application of the settled rules of construc-

tion make the general terms so used include the means necessary to the accomplishment of the organic purpose in restraint of the letter of other clauses having different purposes.    This construction vests tremendous power in the governor, and its exercase may produce frightful consequences, but, as in the other cases mentioned, it is the necessary means of prevention of still worse results.    Thus government is not perfect.    It cannot be in the nature of things.

The clause inhibiting suspension of the writ of *habeas corpus* is relied upon as an element differentiating our Constitution from that of the federal government and those of some other states.    With this phase of the case we dealt at some length in the opinion in the *Nance* and *Mays Cases*.    In addition to what was said there, we observe that the guaranty of the privilege of the writ of *habeas corpus* adds nothing to the guaranties of due process of law, trial by jury, cognizance of causes by civil courts and supremacy of the civil over the military power. This writ does not confer rights.    It only vindicates such rights as are given by law.    It is a remedy, not a law creating or declaring rights    The courts are always open to applications for the writ and always grant it upon proper application, but it does not follow that every one who applies for it, or makes the necessary affidavit, is entitled to be discharged.    It may be the duty of the governor and every military officer of the state to recognize the writ and make return thereto, but that is not conclusive of the question whether the applicant shall be discharged    or    accorded    such    other    relief    as    he    claims. If on the return it appears that under some power vested by the Constitution or a statute, the governor or such other officer as has the applicant under arrest or imprisoned, has power and authority to detain or imprison the applicant, he cannot be discharged.    In seeking the vindication of    constitutional rights on a writ of *habeas corpus,* the applicant is bound by such power and authority as are vested in the person by whom he is detained.    He cannot be discharged unless illegally restrained of his liberty, and he is not so restrained, if the law authorizes or justifies his detention, whether the officer be a constable, a police officer, the military forces or the governor of the state.    In other words, the writ adds nothing whatever

to the guaranties or rights vested by law, nor does the guarantee of the privilege thereof in any way cut down or limit the rights and powers vested in officers by law, constitutional or statutory, either in express terms or by implication.

But it is said there can be no war in a state. It suffices to say, in response to this, that *Luther* v. *Borden* and *Moyer* v. *Peabody* expressly decide that the Constitution of the United States does not inhibit the declaration by a state of a state of war within its own borders by proper authority. State courts other than this have asserted the same proposition. *In re Moyer,* 35 Colo. 159; *Commonwealth* v. *Shortall,* 206 Pa. 165. In the latter case, the court said: "The effect of martial law is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security of life and property are concerned there is no limit but the necessities and exigency of the situation. And in this respect there is no difference between a public war and domestic insurrection. What has been called the paramount law of self-defense, common to all countries, has established the rule that whatever force is necessary is also valid." *Ex parte Moore,* 64 N. C. 802, also declares a governor of a state may proclaim a state of war and recognize the status of belligerency. The opinion in that case is inconsistent with those of the Supreme Court of the United States except in one respect. The court fell into the fallacy above noted, respecting the clause forbidding suspension of the privilege of the writ of habeas corpus, and said it denied power in the governor to detain prisoners, and required him to turn them over immediately to the civil authorities for trial. Plainly there is nothing in the law securing the privilege of the writ of *habeas corpus* that confers any such right. It must be found, if at all, in some provision or principle.

As to what constitutes an insurrection or state of war or rebellion, the authorities are fairly clear. In Pennsylvania and Colorado, the occasions of the declaration, adverted to in *Commonwealth* v. *Shortall* and *Moyer* v. *Peabody,* were very similar to the one calling for the proclamation here involved. A similar situation, growing out of a different cause, was the basis of the proclamation in North Carolina. These authorities

show that it need not take the form of an attempt to set up a new government by name.   "The rule of the common law is that, when the regular course of justice is interrupted by revolt, rebellion or insurrection, so that the courts of justice cannot be kept open, civil war exists, and  the  hostilities  may  be prosecuted on the same footing as if those opposing the government were foreign enemies invading the land.   The converse is also regularly true; so that, when the courts of a government are open, it is ordinarily a time of peace.   But though  the courts be open, if they are so obstructed and overawed that the laws cannot be peaceably enforced, there might, perhaps, be cases in which this converse application of the rule would not be admitted."   18 Fed. Cas. No. 10, 755a.   "A state of actual war may exist without any formal declaration of it by either party; and this is true of both a civil and foreign war. A civil war exists and may be prosecuted on the same footing as if those opposing the government  were  foreign  invaders, whenever the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts cannot be  kept open.".   These definitions are given in prize cases and  the political status ascertained and determined as the  basis  of settlement of property and commercial rights.   They are not conclusive as to the state of affairs, when viewed from other standpoints.   The question we have here is an entirely different one, insurrection or rebellion in the sense of justification of a declaration of a state of war by competent authority.   War is not necessarily a rising of the people in an armed effort to establish a rival government.   As to what constitutes a levying of war, under a statute against treason, a very similar one to the question we have here, Sir Matthew Hale says, Pleas of the Crown, Vol. I., p. 149: "What shall be said a levying of war is partly a question of fact, for it is not every unlawful or riotous assembly of many persons to do an unlawful act, tho *de facto* they commit the act they intend, that makes a levying of war, for then every riot would be treason, and all the  acts against riotous and unlawful assemblies, as 13 H. 4 cap. 7; 2 H. cap. 8; 8 H. cap. 14, and many more had been vain and needless; but it must be such an assembly as carries with it *speciem belli,* as if they ride or march *vexillus explicatis,* or if

they be formed into companies, or furnished with military
officers, or if they are armed with military weapons, as swords,
guns, bills, halberds, pikes, and are so circumstanced, that it
may be reasonably concluded they are in a posture of war, which
circumstances are so various, that it is hard to define them
all particularly." On page 152, he says the levying of war
against the king is of two kinds, express and interpretative.
Of the latter he said: "Constructive or interpretative levying
of war is not so much against the king's person, as against
his government: if men assemble together *more guerrino* to kill
one of his majesty's privy council, this hath been ruled to be
levying of war against the king. P. 16 Car. 1. Cro. 583. Ben-
sted's case before cited, and accordingly was the resolution of
the house of lords 17 R. 2. Talbot's case above-mentioned. So
in the case mentioned by my lord Coke in the time of H. 8 Co.
P. C. p, 10. levying war against the statute of Labourers and
to inhance servants wages was a levying of war against the
king; and altho levying of war to demolish some particular
inclosures is not a levying of war against the king, Co. P. C.
p. 9, yet if it be to alter religion established by law, or to go
from town to town generally to cast down enclosures, or to
deliver generally out of prison persons lawfully imprisoned,
this hath been held to be levying of war for those pur-
poses treason within that clause of the act of 13 Eliz.
cap. 1. as was resolved in Barton's case and Grant's case
above mentioned; and the like resolution was in the case
of the apprentices that assembled *more guerrino* to pull
down bawdy-houses." That the condition of the courts is not
the sole criterion seems to be very well settled, when the ques-
tion is justification of a declaration of war. In *Elphinstone* v.
*Bedreechund,* 1 Knapp 316, the statement of the case shows
some of the civil courts were open when the transaction out of
which the case grew occurred. The syllabus says: "The
circumstances, that at the time of the seizure the city where it
was made had been for some months previously in the undis-
turbed possession of the provisional government; and that
Courts of Justice under the authority of that government were
sitting in it for the administration of justice, do not alter
the character of the transaction." In *Marais* v. *General Officer,*

decided in 1902, the English Privy Council, presided over by the Lord Chancellor of England, re-asserted this doctrine, saying: "The fact that for some purposes some tribunals have been permitted to pursue their ordinary course in a district in which martial law has been proclaimed is not conclusive that war is not raging." Though civil courts are open, as was shown in that case, their jurisdiction is denied, when it essays to interfere with executive action. On this point, the Lord Chancellor said: "The truth is that no doubt has ever existed that where war actually prevails the ordinary Courts have no jurisdiction over the action of the military authorities." Speaking of this decision in an article re-produced in 18 Law Quarterly Review, 1902, Sir Frederick Pollock, an eminent English authority, said: "The judgment involves the further position that neither an application for summary release from extraordinary arrest nor an action for anything done as an extraordinary act of necessity will be entertained by the ordinary courts during the continuance of a state of war in the jurisdiction, when the court is satisfied that a responsible officer acting in good faith is prepared to justify the act complained of. I do not know that this is seriously objected to." In the following terms, he goes beyond the doctrine of the *Milligan* and *Marais Cases* and the position taken here: "There may be a state of war at any place where aid and comfort can be effectually given to the enemy, having regard to the modern conditions of warfare and means of communication." The declaration in *Moyer* v. *Peabody,* cited, averred that the courts of Colorado were open and could have tried the petitioner at the time of his detention by the governor, and the United States Supreme Court held the circumstances insufficient to make a good declaration against the governor for false imprisonment. In *Dow* v. *Johnson,* 100 U. S. 158, there was involved the judgment of a civil court, open and running in New Orleans, by virtue of the permission of the military commander. Nevertheless, its judgment was declared void by the United States Supreme Court for want of jurisdiction. Of the civil courts, Mr. Justice Fields said in that case: "They are considered as continuing, unless suspended or superseded by the occupying belligerents." This necessarily implies power to suspend them

or supersede them.    Hence it follows that, although for some purposes they are open and in some respects their service efficient, they are clearly not inconsistent with martial rule or a declaration of war.    In *Moyer* v. *Peabody,* cited, the   court said: "Public danger warrants the   substitution   of   executive process for judicial process.   *   *   *   As no one would deny that there was immunity for ordering a company to fire upon a mob in insurrection, and that a state law authorizing the Governor to deprive citizens of life under such circumstances was consistent with the Fourteenth Amendment, we   are   of opinion that the same is true of a law authorizing by implication what was done in this case."   "Martial law is the temporary government and control by military authority of territory, in which, by reason of war or public danger, the civil government is inadequate to the preservation of order and the enforcement of law."   40 Cyc. 387.   What is inadequacy of the civil power, exercised by courts?    Does it suffice for the purposes of government that the courts may fairly try civil cases or some classes of criminal cases, while the guns of civil conflict roar almost within their hearing, and blood flows and lives are in process of extinguishment and those engaged in it cannot be, or, at least, are not, restrained by the ordinary criminal processes? Is this adequate government by the civil power?   Under such circumstances, are not some of the guaranties of the Constitution, which all officers are sworn to enforce, set aside in point of fact as effectually as if the courts were not sitting at all and could not sit?   Must the executive   arm   remain   at   rest, because all guaranties are not set aside, as to all people or in all places?    Reason and authority answer in the negative.

If insurgents or rebels must be turned over   to   the   civil authorities as fast as seized, when the courts cannot or will not try them, though sitting and performing other functions, the courts become, by reason of their existence, agencies or instrumentalities of resistence of the exercise of necessary executive power.    Under the rights of continuance and bail, given by the civil law, or indulged by courts affected with   sympathy, timidity or fear, those arrested can be released to re-engage in the conflict, and the courts themselves become passive or active, though incidental, factors in the maintenance of forcible resist-

ance of law and order. Thus the construction insisted upon runs to a palpable absurdity as well as contravention of principles of sound public policy. A process of analysis, leading to such results, is condemned by rules of interpretation and construction, recognized everywhere. *Hasson* v. *Chester,* 67 W. Va. 278; *In re Moyer,* 35 Col. 159.

On this question, authority is meager for the obvious reason that it is a political one, not subject to judicial review, the courts everywhere holding a declaration of a state of war by competent authority to be conclusive of the fact. Hence the reported cases show no instance of court interference with executive action as to that question.

Whether there was justification for the declaration of a state of war in this instance is not an open question. By all authority, the declaration of a state of insurgency or war by competent authority is conclusive upon the Court. *Luther* v. *Borden,* cited; *Moyer* v. *Peabody,* cited; *In re Moyer,* 35 Col. 159. If, however, it were an open question, we would be unable to say, in view of the circumstances detailed in the returns, there was not sufficient ground for the declaration. In the territory covered by the proclamation, armed forces have been contending with one another for nearly a year. Many persons have lost their lives and property has been destroyed, railroad trains have been interfered with, execution of the law by the civil officers has been resisted and prevented by force of arms, and much worse results have been threatened. Though the courts of Kanawha county have been sitting outside of the district, nobody has been brought to trial, arrested or indicted for any of these offenses. If the courts could have acted, they have not done so. What efforts have been made to enforce the law and punish offenders are not fully disclosed, but the fact is, nothing has been done. Why this state of affairs has been permitted to exist by those who ought to have suppressed it, if it was within their power to do so, is rather a collateral question. The interest of the state and of the general public imperiously demand termination of it, no matter what the cause.

The declaration of a state of war was in law and fact a recognition or establishment of belligerency and made the

inhabitants of the military district technically enemies of the state, even though another executive might not have regarded the facts sufficient to warrant the action.    Errors in decision do not destroy or establish lack of jurisdiction.    This  is  a principle universally recognized.

Though *Moyer* v. *Peabody,* cited, *Luther* v. *Borden,* cited, and *Commonwealth* v.' *Shortall,* cited, do not assert power or authority in the executive of a state, under an executive declaration of military government in a portion thereof, to try citizens by a military commission, the general principles asserted by all of these decisions fairly include it.    In no way do they distinguish the exercise of this power in a state from that    of similar  power  in  the  federal  government  executed  by  the president under authority conferred  by  congress.    In    the *Shortall Case,* the court said: "What has been called the paramount law of self-defense, common to all countries, has established the rule that whatever force is necessary is also lawful. While the military are in active service in the suppression of disorder and violence, their rights and obligations as soldiers must be judged by the standard of actual war."    In    *Luther* v. *Borden* the Court said: "And, unquestionably, a state may use its military powers to put down an armed insurrection too strong to be controlled by the civil authorities.    The power is essential to the preservation of order and free institutions, and is as necessary to the states of this Union as to    any    other government."    That case denies the right of a state to set up a permanent military government, but it admits the right of a state to exercise military power for self preservation on exactly the same principle as that on which the same power has been shown to exist in the national government.    Only one  of    the cases, *Moyer* v. *Peabody,* involves right of detention of a citizen under arrest and denial of his claim of right to immediate surrender for trial by the civil courts, and the Supreme Court of the United States justified his detention upon    the    same principles upon which military government    and    administration of martial law, as applied to citizens, is justified in the national government.    All of these cases assert the principle and none of them qualify or limit it.    Hence none of them is authority against power in the executive of a state, in the

suppression of an insurrection or rebellion, to cause persons to be tried by a military commission for offenses committed within the territory declared to be in a state of war, and we have found no authority of that kind except the *Moore Case* in 64 N. C. 802, in which the court, after having decided that the governor was bound to make immediate surrender of prisoners to the civil tribunals, admitted its inability to enforce the declaration and denied that its writs had any virtue or effect inside the military district.

As a result of these principles, views and conclusions we have two areas or sections in the state, by virtue of a declaration of a state of war in the district, in which the powers of government and the rights of citizens differ most radically. The tremendous power of the governor in the military district does not extend beyond the limits thereof. Nevertheless, he is the governor of the peacable territory of the state and has such powers as are normally vested in him by the Constitution and the laws, and any additional authority the legislature may have conferred upon him in pacific territory in the event of such exigencies, not violative of constitutional provisions. In the language of John Adams, the state has a peace power and a war power, both of which are now active. We construe the returns of the respondents as asserting, for the purposes of this case, the power of detention of the petitioners, not a right to try them by a military commission. Having shown the existence of a state of war in the area covered by the governor's proclamation, and the steps taken to suppress the insurrection and lawlessness in that territory, the returns say the petitioners have been largely instrumental in causing and encouraging the lawlessness, riot and insurrection, and that their detention, is, in the judgment of the executive, necessary in order to effectually suppress the same. This sufficiently charges them with having wilfully given aid, support and information to the insurgents, the enemy, in a time of war, insurrection, and public danger, and section 6 of chapter 14 of the Code confers upon the governor power to apprehend and imprison all such persons. Such acts may be done either inside or outside of the military district. Nothing in the terms of the statute limits the exercise of this executive power of apprehension and

imprisonment to persons within the military district, and it is
obvious that persons outside of such district may do as much
or more than persons inside of it to defeat executive action,
looking to the suppression of the insurrection or rebellion.
Hence there is no reason for such a limitation. On the con-
trary, there is good reason against it, wherefore we must say
the legislature intended no such a limitation, and the statute
contemplates such arrests and imprisonment of persons, com-
mitting these acts outside of the military district.

We have just seen that this power of detention, as exercised
by the governor of the state of Colorado was sustained by the
Supreme Court of the United States in *Moyer* v. *Peabody.*
Moreover, we see no reason for saying it violates, in any
respect, any of the constitutional guaranties. It is statutory
authority in the governor, and if not in violation of the Consti-
tution, it amounts to due process of law, within the meaning
of the Fourteenth Amendment to the Constitution of the
United States. It contemplates imprisonment without trial
by jury, but not by judgment of conviction of a crime. The
exercise of this power involves no change or status from citizens
to convicts. It is, therefore, not a deprivation of liberty
without a trial by jury, within the meaning of the constitutional
guarantees. Such apprehension and imprisonment are the
same in principle as those of persons accused of crime. On all
sorts of charges, from assault and battery to first degree murder,
citizens are daily arrested and imprisoned to await examination,
indictment and trial. There may be imprisonment without a
jury trial, for contempt of court. *State* v. *Gibson,* 33 W. Va.
97; Cooley Cons. Lim. 453. Persons offending against city
by-laws may be imprisoned, without a trial by jury, if the
offense is not made a crime. *McGear* v. *Woodruff,* 33 N. J. L.
213. It was not the purpose of the framers of the Constitution
to interfere with the course of the common law, by the incorpo-
ration of this guarantee, and, by that law, persons guilty of
petty offenses and contempt of court and accused of crime could
always be imprisoned without a jury trial. *McGear* v. *Wood-
ruff,* cited; *In re Rolfs,* 30 Kan. 758.

As this statute is a law, conferring power upon the governor,
action under which constitutes due process of law, provided the

statute itself is constitutional, a question about which we have
no doubt, and, as the returns show the existence of a state of
war, an insurrection and certainly a time of public danger, any
of which seems to have been made a condition precedent to the
exercise of the power, the detention of these prisoners, although
arrested outside of the military district, is, in our opinion,
entirely valid and legal.

Hence discharges were refused and they were remanded to
the custody of the military authorities acting under the control
and direction of the governor.

<em>Petitioners Remanded.</em>

ROBINSON, JUDGE, (*dissenting*):

May citizens accused of civil offenses be tried, sentenced, and
imprisoned or executed, by military commissions at the will
of the Governor of this State, notwithstanding the civil courts
having jurisdiction of the offenses are open? This is the ques-
tion made by the record in these cases. It is none other. Nor
can it be reduced to any other. The question is not that of
the power of the Governor to use the militia to execute the laws,
suppress insurrection, and repel invasion. That the Governor
has constitutional and statutory power so to use the militia and
thereby to arrest persons as far as it is reasonably necessary,
no one will deny. But because the Governor has this power,
must judicial construction run random and thrust upon the
citizens of this State military courts for the trial of civil offenses,
in the very face of the direct inhibitions against such procedure
contained in our Constitution, and regardless of all constitu-
tional guaranties?

Not a case cited in the majority opinion, other than the
former decision of the majority in the Nance and Mays cases,
not an authority relied on by the majority in these present
cases of those former ones, sustains the holding that citizens
may be tried and condemned for civil offenses by military
commissions at the unrestrained will of the executive when the
courts having jurisdiction of those offenses are open and
operative.

But whatever might be the law elsewhere, our own Consti-
tution should control. The doctrine promulgated by the

majority and that Constitution can not stand together. They are totally at variance. By the most direct and explicit provisions, the people of this State when they adopted the Constitution supposed they had forever precluded insistence upon such arguments as the majority opinion puts forth. They meant to guard against such misconception of constitutional liberty as that into which the majority of the Court has fallen. The people declared against the suspension of the Constitution at any time, war or no war, on any plea whatsoever. Yet the majority of this Court holds that it may be suspended whenever the Governor by proclamation, right or wrong, sees fit to suspend it. The people ordained that the privilege of the writ of habeas corpus should never under any circumstances be suspended. Yet the holding of the majority is to the effect that the Governor may make that sacred writ totally unavailing. The people further ordained that no citizen not in the military service should ever be called to answer before a military court for a civil offense. Yet the majority holds that any citizen may be subject to trial and condemnation before a military commission whenever the Governor sees fit to displace the civil courts by a proclamation to that effect.

How can the majority decision in these cases and the former ones be upheld in the face of the Constitution of this State? Hear some of its plain provisions again, and then say if the Constitution may be departed from, and a citizen not a soldier subjected to trial and punishment before a military commission for a civil offense.:

"The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism." Art. 1, sec. 3.

"The privilege of the writ of habeas corpus shall not be suspended. No person shall be held to answer for treason, felony, or other crime, not cognizable by a justice, unless on presentment or indictment of a grand jury." Art. 3, sec. 4.

"No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." Art. 3, sec. 10.

"The military shall be subordinate to the civil power; and no citizen, unless engaged in the military service of the State, shall be tried or punished by any military court, for any offense that is cognizable by the civil courts of this State." Art. 3, sec. 12.

"Trials of crimes, and of misdemeanors, unless herein otherwise provided, shall be by jury of twelve men, public, without unreasonable delay, and in the county where the alleged offense was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county. In all such trials, the accused shall be fairly and plainly informed of the character and cause of the accusation, and be confronted with the witnesses against him, and shall have the assistance of counsel, and a reasonable time to prepare for his defense; and there shall be awarded to him compulsory process for obtaining witnesses in his favor." Art. 3, sec. 14.

"The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." Art. 3, sec. 17.

When we observe these provisions of our State Constitution or look at that instrument as a whole, we see how clearly applicable to it are the words applied to the Federal Constitution by a preeminent authority: "There is nothing in that instrument to indicate that the guaranties which it affords for life or property are to cease on the occurrence of hostilities. A contrary design is manifested unmistakably with the utmost clearness." Hare's American Constitutional Law 963.

But, says the majority, it was implied and presumed that these constitutional provisions were not always to be followed. See syl. 2, in the cases of *Nance* and *Mays*, 77 S. E. 243. What legal doctrine is this? When before has it been declared that express provisions of a constitution may be set aside by mere implication and presumption? From what does the implication and presumption arise? The majority says, from the provision which establishes a militia and gives the Governor power to call out the same to execute the laws, suppress insurrection, and repel invasion, and from the inherent right of sovereignty to preserve itself. In other words, because the

Constitution provides for the existence of a militia, it means that the militia shall have power to supplant the civil law. Yet the Constitution has said plainly that the militia should not supplant the civil law—should not try citizens for civil offenses and deprive them of the precaution of an indictment before a grand jury and the right to the judgment of their peers. Can the mere provision for a militia annihilate the other and more explicit provision? Does the one repeal the other? By every known rule of construction, they must be made to stand together. True, a militia is provided for; but unmistakable restriction is placed on the use of that militia. Is it not within the power of a constitution to limit and restrict? Are not such instruments supposed to construct, mark out, and limit? Must the express restrictions as to the use of the militia give way merely because of the provision which brings the militia into existence? But, further, the majority says that there is a presumption that in the promulgation and adoption of the Constitution the people did not mean to abolish a generally recognized incident of sovereignty, the power of self preservation of the State by its military forces in cases of invasion, insurrection, and riot. If there ever existed a generally recognized incident of sovereignty whereby a state could deprive its own citizens of presentment and trial by jury for civil offenses and subject them to trial for such offenses before military courts, our people certainly did mean to abloish that incident, for they used explicit words sufficient to abolish the same. It can not be presumed that the people meant to retain military trial of its citizens for civil offenses, when they explicitly say that no such trial shall ever be had. No, the founders had good reasons to abolish it and to leave no room for implication or presumption to the contrary. The argument of the majority goes to this, the founders could not do away with that implication and presumption unless they abolished the militia itself. Having retained the militia, the majority would say, the makers of the Constitution retained trial of citizens by military courts regardless of the specific and direct words of those makers to the contrary. Such argument leads to palpable absurdity.

In consonance with the provisions of our Constitution, the

71 W. Va.

Legislature has specifically provided for the militia to be used only *in aid of the civil authorities* when such a state of affairs exists as that disclosed by the record in these cases. Code 1906, ch. 18, secs. 55-64. Indeed throughout the whole military code, the relation of the militia to the civil law is always apparent. Its existence and use for the enforcement of the civil law, not its own law, is clearly recognized. Nowhere is its independence of the civil law even hinted at. The militia is a citizen soldiery. It is not an imperial army. Nor is it at all in keeping with American traditions even to think of making it such, or giving it dominancy at any time to supplant the ordinary laws of the land. Why was not the true relation of the militia recognized for the enforcement of law in Cabin Creek District? What necessity existed for using the militia differently from the way the Legislature has said it shall be used when such conditions exist as those disclosed in these cases? Why disregard the plain direction of the statute which says it shall be used in aid of the civil authorities? It is no answer to say that the legal method is insufficient. The law-makers deemed it sufficient, and provided no other method. Can the Governor renounce the wisdom of the law-makers, and assert his will through the militia against our own citizens as though they were foreign enemies?

Truly it would seem that the use of the militia in aid of the civil authorities is all sufficient for the quelling of any unlawful disturbance in a single magisterial district of this great State and for the bringing of all offenders to trial before the constitutional courts. But it is said that the Governor's proclamation establishing other means can not be reviewed by the courts. Is the Governor thus immune from the law? Can he, because of an assault and battery between two persons, or the murder of one person by another, issue a proclamation of martial law, and through the use of the militia order the offender to be imprisoned or hanged, and the courts have no power in the premises? If he is to be the absolute judge of the necessity for establishing martial law in one case, why not in any case though no necessity exists? That the illegal acts of the Governor may be reviewed by the courts as well as those of any other officer, certainly needs no argument. This Court has declared

a veto of the Governor to be illegal and void. Acts of the Legislature are set aside by the courts as illegal. Remember, the writ of habeas corpus is always available in this State. Our Constitution plainly says it shall be. It makes no exception even for invasion and rebellion, as most constitutions do. By that writ any unlawful imprisoning of a citizen may be reviewed. By it a Governor's proclamation if not warranted in law and in fact must give way. That great writ of freedom can never rightly be proclaimed away in this State. Executive, or even legislative acts, can not suspend it.

My position in these cases, as in the Nance and Mays cases, is rested squarely on our own Constitution and laws. Why go elsewhere for authority? But it is not wanting elsewhere. It is prevalent and pronounced in opposition to the majority holding.

In connection with what may be said by me in these cases, my former dissenting opinion in the similar cases of *Nance* and *Mays*, 77 S. E. 247, should be read as applicable, explanatory, and additional.

The argument that to preserve the life of the State the Governor must be given such extreme and dominant power as the majorty has accorded to him,. may be answered by asking one question: Is this great State in its death throes because of rioting and unlawful acts in a single magisterial district? If the State has become so impotent in its sovereign powers under the civil law as to be in danger of its existence because of mere private dissensions and disturbances in a small isolated district, it is time for patriotic citizens to arise. The State can not be preserved by a suspension of constitutional rights. Nothing will kill it quicker. ' The words of the Supreme Court of the United States on this line are most significant: "It is insisted that the safety of the country in time of war demands that this broad claim for martial law shall be sustained. If this were true, it could well be said that a country, preserved at the sacrifice of the cardinal principles of liberty, is not worth the cost of preservation." *Ex parte Milligan,* 4 Wall. 126.

, Nor does the suggestion that the civil courts, officers, and juries are inefficient, sound well. That is the same excuse that is invariably given for suspending the Constitution and

laws when a lynching takes place.    Why were not the civil authorities aided by the militia as the law directs? If this had been done, would they have been inefficient? It is a mere assumption to say that they would have been. Their functions were supplanted.    The militia, under proclamation of the Governor, set up a court of its own, and denied all criminal jurisdiction of the civil courts and officers, even as to civil offenses committed before the proclamation.    Say the civil authorities are inefficient.    Do two wrongs ever make a right?

It may be claimed that the majority opinion only authorizes arrest and detention until the disturbances are suppressed.    Why the extended argument and citation seeking to justify trials, sentences, and punishment by military commissions.    What does the approval and reaffirmance of the holding in the Nance and Mays cases mean?    The majority refused to discharge Nance and Mays from the penitentiary, thereby upholding their military sentences to that penal institution.    Read again the syllabus to the opinion in those cases.    There it is directly held that the militia may not only arrest and detain, but by military commission may try citizens and sentence them to the penitentiary, for civil offenses amounting under the civil law only to misdemeanors.    Moreover, read syllabus 2 to the majority opinion herein.    It holds that the civil power as to offenses is excluded by the military proclamation, and that the usages of nations prevails over our own citizens.    In fact it holds that our citizens are to be dealt with as alien enemies.    That the issue in these cases involved the question of trial, sentence, and punishment by military commission in the place of the civil courts can not be gainsaid when the petitions, writs, returns, and briefs are examined.    That petitioners sought not discharge from custody, but freedom from military trial by an order of this Court remanding them to the civil courts for trial, their pleadings show.    That the military authorities were claiming absolute jurisdiction to try, sentence, and punish petitioners and were denying all jurisdiction of the civil courts in the premises, was charged by petitioners and not denied by the respondents. That charges and specifications accusing petitioners of civil offenses were pending before a military commission, is shown by the respondents themselves in their returns.    That immedi-

ately after the decision in these cases petitioners were put on trial before a military commission and by it tried for the civil offenses charged, is common notoriety from the public press. That the military authorities claim the right to act absolutely independent of the civil authorities in the so-called military district, and to try, condemn, sentence, and imprison in the state penitentiary for a specific term, any citizen for a civil offense, whether connected with the disturbance between the mine owners and the miners or not so connected, is a fact pregnant from every part of the records in these cases and the former cases of Nance and Mays, particularly from the proclamations and military orders of the Governor. That the military authorities have been and still are exercising such anomalous jurisdiction, that they even deny that the sheriff of the county may enter the district which they have marked out and there serve the process of the civil courts, is a matter of State history. The issue was clear. It was this: Should the petitioners be remanded for trial to a military court claiming exclusive and final jurisdiction of the civil offenses charged against them, and thus be put in jeopardy of conviction and confinement in the state penitentiary without presentment and trial by jury? This Court should have promptly condemned the unwarranted procedure to which the majority subjected petitioners. It should have given notice to all that this State is a land of constitutional courts, not one of imperial military courts.

Petitioners were arrested in the city of Charleston on a warrant of a justice of the peace, a civil court, charging them with civil offenses, that of conspiring to inflict bodily injury on persons whose names were unknown, and other offenses. They were taken before the justice, within sight of the courthouse, where the civil courts of the county were open and in the exercise of their powers. Instead of giving the accused preliminary examination, and upon the finding of probable cause holding them to answer the grand jury, the justice directed the special constables having them in charge, by endorsement on the warrant, to deliver them to the military authorities in the so-called military district. The exception of petitioners to such unknown procedure did not avail. They were so delivered and

were about to be put on trial before a military commission, for the same offenses charged before the civil court, when the writs of habeas corpus were awarded them. Though petitioners were arrested and brought before a civil court—the justice of the peace—that court in absolute disregard of their rights and the law governing it, sent them to the military authorities in a distant part of the county.    This illegal procedure   alone entitled petitioners to be remanded to the civil courts.   Yet it simply illustrates the extreme to which disregard of constitutional and legal procedure has run.   Instead of recognizing the true order of the statute whereby a militia is to aid the civil authorities, the law is reversed, and the civil authorities are used to aid the military power.   Verily indeed has the military power been made absolute, independent, and dominant in West Virginia!

Why resort is made to sections 6, 7, 8 and 9, of chapter 14 of the Code, one familiar with the record in these cases can not conceive.   No reliance was placed on these sections by the military authorities.   They were not content with the limited powers mentioned therein, for these sections do not provide for military trial and sentence.   Nothing short of a court of their own and the sending of citizens to the penitentiary for specific terms without trial by jury will satisfy the military authorities. Besides, these sections provide only for the arrest of   certain persons on a warrant or order issued by the Governor.   They were not invoked by the Governor.   *He issued no warrant or order for the arrest of petitioners.*   If reliance had been made on these sections, the absence of the basic warrant or order of the Governor would have entitled petitioners to discharge.   Is not this elementary law?   Again, these sections of the statute apply only to enemies of the State, to those who give aid. support, or information to the State's enemies, to those who conspire or combine together "to aid or support any hostile action against the United States or this State."   These sections are made for public war, not for the mere private conflict as to which the state is not a party but is only the great conservator of the peace through the civil law.   An examination into the origin and history of these enactments, to say nothing of their direct words, will disclose that they were made for times when

71 W. Va.

enemies seek to overthrow the government. See Ordinances of the Wheeling Convention of 1861, pages 7 and 8; Code 1868, ch. 14, secs. 5-9; Acts 1882, ch. 144, secs. 5-9.

A clash between mine owners and miners can not be considered public war, and the participants dealt with as enemies of the State. True it is that in war the enemy, whether a foreign one or a rebel to whom the status of belligerent has been given, has no legal rights which those opposed to him must respect. But have either the mine owners and their guards on the one side, or the miners on the other, assumed the status of belligerency against the State? Because of warfare between themselves and violations of the law in relation thereto, has neither side any constitutional rights which the State is bound to respect? Nothing in the record justifies the conclusion that either the mine owners and their guards on the one hand, or the miners on the other, have lost their allegiance to the State by the unfortunate clash between them or by any other act. Neither faction has made war against the State. Each time the militia has been sent to the district, all has remained quiet. Chief Justice Marshall early defined what it is to make war: "To constitute a levying of war, there must be an assemblage of persons for the purpose of effecting by force *a treasonable purpose.*" *Ex parte Bollman,* 4 Cranch 75. Nothing even reminding one of treasonable purpose is involved in these cases. Yet the majority opinion deals with the citizens of the district as rebels. It deals with a part of Kanawha county as enemy country. In this it can not be sustained by reason or authority. *Cabin Creek District has not seceded!* The residents of that district are citizens of the State under its civil protection, though they may have violated the law. Because one violates the law, does he lose his legal rights? The guiltiest man, if he is not an enemy in public warfare directly against the State, is entitled to all rights as a citizen. "War, in public law, has, as is well known, a definite meaning. It means a contest between public enemies termed belligerents, and to the status thus created, definite legal rights and responsibilities are attached by international and constitutional law. *War is thus sharply distinguished from a mere insurrection or resistance to civil authority.*" Willoughby on the Constitution, sec. 730.

The failure in the majority opinion to observe the sharp distinction between public war and civil disorder, between enmity against the State and individual enmity between citizens of the State, between rebels and mere violators of the law, between belligerent territory and territory retaining allegiance, accounts for the misapplication of decisions, legislative enactments, and quotations relied on therein. An examination of those decisions, enactments, and quotations with this distinction in view will show how inapplicable they are. They relate to public war and to public enemies. We are not dealing with public war or with public enemies. With the exception of the Moyer cases, and the Shortall case, to which reference will be made later, the cases relied on for the majority relate to various questions growing out of public war. That which may be allowable by the usages of nations in a public war can not be applied as against citizens of a State engaged in civil disorder. See Hare's American Constitutional Law 922. "The populace being loyal, and the territory domestic, private rights of persons and property still persist, though subject, as in all other cases, to the exercise of the police powers of the State." Willoughby on the Constitution, sec. 732. Nor can the Governor by proclamation or otherwise make that public war which in fact is not such. He can not install martial law in a time of peace, when every civil court of the State is open, under the guise of a proclamation of public war which in fact does not exist. "The existence of martial law does not in any way depend upon the proclamation of martial law." Dicey on the Law of the Constitution 545. "Indeed, it may be said that a State of the Union has not the constitutional power to create, by statute or otherwise, a state of war, or by legislative act or executive proclamation to suspend, even for the time being, all civil jurisdiction." Willoughby on the Constitution, sec. 730.

Military commissions have existed in public wars,—in conquered enemy countries. But no military commission for the trial of citizens, usurping all criminal jurisdiction of the courts, has ever before been sanctioned or recognized as to a state militia in the quelling of domestic disorder. Indeed the majority cites no adjudicated case in which such trial by

military commission has been upheld even as to public war. In public wars, military commissions have been installed in conquered foreign territory, or conquered rebellious territory, out of the actual necessity arising from the fact that the courts were closed or were not in sympathy with the obligations of the conquering country to society. They properly pertain nowhere else. Never before has any State of the Union disowned its civil courts and ordained that military commissions shall take their place. No such thing has been done anywhere since the declaration of the Petition of Right. Yet with us it has been done in the face of the fact that nothing whatever prevented the taking of offenders, arrested by the militia in the quelling of disorder, before our civil courts and there subjecting them to trial in constitutional form. The way to the courthouse was unobstructed. If the militia could arrest offenders and secure witnesses for its own assumed court, it could do so as readily for the legally organized courts. Nothing so readily establishes respect for the law as respect for it by those in power. The reverse is equally true.

The effort in the majority opinion to sustain military commissions by asserting that the opinion in the Milligan case and the writings of Lieber, Ballantine, and others distinguish between pacific territory and the theater of actual war, can not avail with any one who fully reads the opinion and writings referred to. Neither the Milligan opinion nor the writings of Lieber, Ballantine, and others uphold arbitrary military trial, on any such distinction, or at all. They do distinguish between territory in rebellion seeking to overthrow the government and territory that has not lost its allegiance—between enemies engaged in public war and citizens violating the law. Read them. For instance Ballantine says: "What may be done on the theatre of actual military operations when our armies are advancing, retreating, or operating within our own territory depends upon military necessity for the public defense, and is to be judged by the circumstances and exigencies of the particular case, *which may be reviewed by the courts irrespective of military proclamations.* Citizens cannot be arrested, deported, imprisoned, or put to death by arbitrary military authority when war is raging any more than during a state of peace, and the fact that the

courts are closed or that a proclamation of Martial Law has been made will not justify a resort to the arbitrary unregulated exercise of military power."

The kind of martial law which the majority of this Court upholds is unknown in England and the United States. All the great writers on constitutional law so assert.

Mr. Dicey, the renowned English author, after quoting the French law which allows constitutional guaranties to be suspended by proclamation, says: "We may reasonably, however, conjecture that the terms of the law give but a faint conception of the real condition of affairs when, in consequence of tumult or insurrection, Paris, or some other part of France, is declared in a state of siege, and, to use a significant expression known to some continental countries, 'the constitutional guaranties are suspended.' We shall hardly go far wrong if we assume that, during this suspension of ordinary law, any man whatever is liable to arrest, imprisonment, or execution at the will of a military tribunal consisting of a few officers who are excited by the passions natural to civil war. * * * * * *Now, this kind of martial law is in England utterly unknown to the constitution. Soldiers may suppress a riot as they may resist an invasion, they may fight rebels just as they may fight foreign enemies, but they have no right under the law to inflict punishment for riot or rebellion.".* Law of the Constitution 288.

The leading American authority of the present day says: "There is, then, strictly speaking, no such thing in American law as a declaration of martial law whereby military is substituted for civil law. So-called declarations of martial law are, indeed, often made, but the legal effect of these goes no further than to warn citizens that the military powers have been called upon by the executive to assist him in the maintenance of law and order, and that, while the emergency lasts, they must, upon pain of arrest and punishment, not commit any acts that will in any way render more difficult the restoration of order and the enforcement of law. *During the time that the military forces are employed for the enforcement of the law, that is to say, when so-called martial law is in force, no new powers are given to the executive, no extension of arbitrary authority is recognized, no civil rights of the citizen are suspended. The*

*relations of the citizen to his State are unchanged.*"   Willoughby on the Constitution, sec. 727.

The majority opinion repeatedly appeals to *In re Moyer*, 35 Col. 159, and its sequel, *Moyer* v. *Peabody*, 212 U. S. 78.   These decisions involve no question of trial by military commission. They go no further than to justify an arrest made by military authorities in the suppressing of civil disorder.   They plainly negative any recognition of military trial and punishment for an offense in connection with the civil disorder.   In the instance to which they relate, the governor of Colorado claimed no right to try and punish by military rule.   He was not an advocate of military commissions.   His return to the writ of habeas corpus expressly avers that Moyer was to be given over to the civil authorities for trial.     Here are its words: "That it is his purpose and intention to release and discharge petitioner from military arrest as soon as the same can be safely done   with reference to the suppressing of the existing state of insurrection in the county, and then surrender him to the civil authorities to be dealt with in the ordinary course of justice after such insurrection is suppressed."   And in disposing of the case, the Chief Justice of Colorado lends no recognition   to   military trial for offenses connected with the civil disorder.   Here is what the Chief Justice, speaking of Moyer, says in the opinion: "He is not tried by any military court or denied the right of trial by jury; neither is he punished for violation of the law nor held without due process of law.     His arrest and detention in such circumstances are merely to prevent him from taking part or aiding in a continuation of the conditions which the governor, in the discharge of his official duties and in the exercise of the authority conferred by law, is endeavoring to suppress.   When this end is reached he could no longer be restrained   of   his liberty by the military but must be, just as respondents have indicated in their return to the writ,· turned over to the usual civil authorities of the county to be dealt with in the ordinary course of justice, and tried for such offense against the law as he may have committed."   In the review of this same arrest in the suit of *Moyer* v. *Peabody, supra,* Mr. Justice Holmes says: "Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of   hostile   power."

He does say that "public danger warrants the substitution of executive process for judicial process," but his remarks must be interpreted in the light of the case before him.   He could not have meant executive process to try and punish for a civil offense, for that question was not involved in the case.   He meant executive process to arrest, not executive process to try and punish.   The former was embraced in the case; the latter was not.   Besides, we have seen that he plainly said that such arrests were not for punishment, but to prevent hostile power. No, Colorado had not gone to the extent of disowning and: supplanting her civil courts by military courts.   The governor of that state disclaimed any such purpose, but directly answered that he was only acting in aid of the civil authorities.   But with us the contention of the governor in every case has been that his military court may make convicts out of citizens.   And. each decision of the majority of this court, viewing the same from the issues involved, to say nothing of the written opinions, has held that the Governor may thus cast upon   citizens   the stigma of having been confined in the penitentiary, though under the civil law the offense involved may have been only a petty misdemeanor.   If the majority meant to go no further than these Moyer cases go, why has it not long ago said to the military authorities: You may arrest and detain for the purpose of preventing hostile power, but you can not by military court send offenders to the penitentiary, as the Governor has ordered. If it meant to go no further, why has it refused to discharge Nance and Mays from penitentiary sentences? If it meant to go no further, why has it plainly remanded the present petitioners to miltary trial and the hazard of punishment in the: penitentiary thereby?

Whether such length of detention as that involved , in   the Moyer cases may prevail in West Virginia where our Constitution has no exception ever allowing a suspension of the privilege of the writ of habeas corpus, need not now be discussed.

Plainly the case of *Commonwealth* v. *Shortall,* 206 Pa. St. 165, is no authority to sustain military courts.   It involves no. question of trial by a military court.   It no more than defines the view of the Supreme Court of Pennsylvania   as to what military acts in the quelling of civil disorder may be excused

on the ground of necessity.    There a soldier on duty in a disturbed district of the State, acting under military orders for the suppression of the disturbances, shot one who did not obey his command to halt.    It was held that the circumstances justified the act.    What has this to do with the supplanting  of civil trial by military trial?    At any rate, see the adverse criticism of that decision in 65 L. R. A. 207.

Moreover, it may be confidently asserted that none of the adjudicated cases cited by the majority, except those criticised or sought to be distinguished by it, have any more relation or come any nearer to the question of military trial than do the Moyer cases and the Shortall case.    They are wide of the mark. On the other hand, such military trial as that fostered by the majority, has received the condemnation of many courts—the clarion denouncement of the highest tribunal  in  this  land: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its· protection all classes of men, at all times, and under all circumstances.    No doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government."    *Ex parte Milligan,* 4 Wall. 120.

In addition to the references made in my dissenting opinion in the Nance and Mays cases, *supra,* the following, by no means all, will be found enlightening: Willoughby on the Constitution, ch. 52; Dicey on the Law of the Constitution, 280-290, 538-555; Hare's American Constitutional Law,  lecture  44; Story on the Constitution, (5th ed.), sec. 1342 and note thereto; Annals of Congress, 9th Congress, 2nd Session, pp.  402-424, 502 *et seq.; Johnson* v. *Duncan,* 3 Martin 530, 6 Am. Dec. 673; *Ex parte Merryman,* Fed. Cas. 9487; *In re  Egan,*  5 Blatch. 319; *Ex parte Benedict,* Fed. Cas.  1292;  *Ex  parte Henderson,* Fed. Cas. 6349; *Johnson* v. *Jones,* 44 Ill. 142; *In re Kemp,* 16 Wis. 382; *Griffin* v. *Wilcox,* 21 Ind. 370; *Jones* v. *Seward,* 40 Barb. 563; Congressional Globe, 38th Congress, 2nd Session, pp. 1421-3; *Franks* v. *Smith,* 142 Ky. 232; 1 Cooley's Blackstone, 413; 6 Great American Lawyers, 233-254; Edinburgh Review, Jan. 1902, pp. 79-105.

Is it not a spectacle for the notice of a people who rest their ·

liberties on our form of constitutional government that in one of the States of the Union a section thereof is given over to an independent military rule, which admits no power of the civil courts to enter, and which claims cognizance as against all found therein of every imaginable accusation from mere words spoken to perjury, rape or murder? Does the peaceful mountain farmer residing therein realize that he is subject not to the civil law but to the will of a military commander who may hear no excuse as to any accusation against him? Do citizens of this Republic passing through that district on one of the great trans-continental lines of railway, realize that for a time they are subject absolutely to the will of one man? It is no excuse to say that the supreme military authority will not be exerted against such. It is bad enough to say that a majority of this Court has held that such authority exists. The majority has held that martial law—the law and usage of public war—can and does exist in that district. Then that martial law "overrides and suppresses all existing civil laws, civil officers and civil authorities, by the arbitrary exercise of military power; and every citizen or subject, in other words, the entire population of the country, within the confines of its power, is subject to the mere will or caprice of the commander. He holds the lives, liberty and property of all in the palm of his hand. Martial law is regulated by no known or established system or code of laws, as it is over and above all of them. The commander is the legislator, judge and executioner." *In re Egan,* 5 Blatch. 321.

The persistency with which a military rule heretofore unknown has been sanctioned, has demanded this second protest on my part.    Unfortunate indeed is the generation that forgetteth the memories of its fathers.